## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | BANKRUPTCY NO. 15-52462-CAG |
| FPMC SAN ANTONIO REALTY | § | |
| PARTNERS, LP, | § | CHAPTER 11 PROCEEDING |
| | § | |
| DEBTOR | § | |

## DEBTOR'S APPLICATION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 327(a) AND 328 AUTHORIZING EMPLOYMENT AND RETENTION OF CBRE, INC. AS REAL ESTATE BROKER FOR THE DEBTOR EFFECTIVE AS OF THE PETITION DATE

TO THE HONORABLE CRAIG A. GARGOTTA, UNITED STATES BANKRUPTCY JUDGE:

NOW COMES the debtor and debtor in possession in the above-captioned case (the "Debtor"), respectfully submit this application (the "Application") for an order, pursuant to Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and sections 327(a) and 328 of title 11 of the United States Code (the "Bankruptcy Code"), for entry of an order authorizing the employment and retention of CBRE, Inc. ("CBRE") as real estate broker for the Debtor, nunc pro tunc to the Petition Date (as defined below). In support of the Application, the Debtors submit the Declaration of Scott Senese, a Senior Managing Director of CBRE, attached as Exhibit "1" (the "Senese Declaration"). In further support of the Application, the Debtor respectfully states as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

2.     On October 5, 2015 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

3.     The Debtor continues to operate its business and manage its properties as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  To date, no creditor's committee has been appointed in this Chapter 11 Case by the Office of the United States Trustee for the Western District of Texas (the "United States Trustee").  No trustee or examiner has been appointed in the Debtor's Chapter 11 Case.

4.     The Debtor's primary asset is a property commonly known as the Forrest Park Medical Center Hospital and Medical Office Building located at 5510 Presidio Parkway in San Antonio, Texas (the "Property").  Forrest Park Medical Center Hospital is a specialty surgical hospital and medical office building. The four-story, 150,000 square-foot hospital has 54 beds — including 16 VIP patient suites — 12 operating rooms, two procedure rooms, state-of-the-art diagnostic imaging, and in-house pharmacy services.  The Property includes an adjacent 4-story, 84,000 square foot Medical Office Building, together with a parking garage.

5.     The Debtor engaged CBRE on October 1, 2015 as its broker to sell the Property pursuant to the Exclusive Sale Listing Agreement.

**RELIEF REQUESTED**

6. The Debtor seeks approval, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014, to employ and retain CBRE as their real estate broker in connection with this Chapter 11 case.

**BASIS FOR RELIEF**

7. CBRE is among the world's largest full service commercial real estate companies. The Debtor seeks to retain CBRE as its real estate broker based on CBRE's experience with the Property pre-petition, and CBRE's knowledge in commercial real estate. CBRE has extensive experience in selling commercial real estate both inside and outside the bankruptcy context. The Debtor selected CBRE to market and sell the Property because of its ability to pool resources and develop and deliver superior analytical, research and client service; its proven track record of meeting client needs; and its position as an industry leader. For these reasons, the Debtor concluded that CBRE has the expertise and resources required to sell the Property and maximize its value.

8. Bankruptcy Code § 327(a) provides that the Debtor is permitted to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons." Section 328 of the Bankruptcy Code provides, in pertinent part, that under section 327 of the Bankruptcy Code, a professional may be employed "on any reasonable terms and conditions of employment, including . . . on a contingent fee basis." 11 U.S.C. § 328(a).

9. Bankruptcy Rule 2014 provides that an application for retention of a professional person include:

> [S]pecific facts showing the necessity for the employment, the names of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, and any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee.

10.     By this Application, the Debtor requests that the Court approve the employment and compensation arrangements described in the Exclusive Sale Listing Agreement attached as Exhibit "2" and described below, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code. The employment arrangement with CBRE will be beneficial to the Debtor's estate because it will provide the Debtor with much needed assistance in selling the Property, the Debtor's primary asset.

11.     Further the Debtor believes that the compensation arrangement detailed in the Exclusive Sale Listing Agreement and described below provides both certainty and the proper inducement for CBRE to act expeditiously and prudently with respect to the matters for which it will be employed.

## SERVICES TO BE PROVIDED BY CBRE

12.     As set forth above, the Debtor employed CBRE pre-petition on October 1, 2015 to assist the Debtor in marketing and selling the Property. Since then, CBRE has become familiar with the Property and is both well qualified and uniquely able to sell the property in a cost-effective and efficient manner.

13.     Further, CBRE is a commercial real estate services firm with full service operations in metropolitan areas throughout the world, including Texas. CBRE offers a range of services to occupiers and owners of, and lenders to and investors in, commercial real estate assets including, but not limited to, property sales and related valuation services. CBRE has extensive knowledge and experience in valuing commercial real estate, and providing commercial real estate related services in Chapter 11 reorganization cases.

14.     Pursuant to the Exclusive Sale Listing Agreement, CBRE will perform services for the Debtors, including, but not limited to, the following:

    a.   marketing the Property;

      b.   assistance with negotiations regarding any potential transactions involving the Property;

      c.   analysis of and recommendations regarding offers for transactions involving the Property; and

      d.   assistance with consummation of any transactions involving the Property.

15.     The Debtor submits that CBRE is particularly well-suited to act as the Debtor's real estate broker because of the firm's recent and intimate knowledge regarding the Property and its globally well-known reputation and experience as real estate brokers, appraisers and consultants.

## SUMMARY OF THE TERMS OF THE EXCLUSIVE SALE LISTING AGREEMENT

16.     The Exclusive Sale Listing Agreement provides that CBRE shall be paid a commission, due in full at the time of closing or transfer of title to the Property, of (i) 1.00% of the gross sales price; however, if the Property is purchased by either Amicus Interests, LLC or OnPointe Health Development LLC, or any of their affiliates, the commission will be thirty three hundredths of a percent (0.33%) of the gross sale price.

17.     The Debtors respectfully submit that, inasmuch as CBRE's compensation is results-oriented and directly related to benefits received by the Debtor's estate, requiring CBRE to file periodic fee applications pursuant to Sections 330 and 331 of the Bankruptcy Code and in compliance with Bankruptcy Rule 2016 is unnecessary. CBRE will be employed by the Debtor to perform highly specialized tasks. It is CBRE's general practice and the general practice of other listing agents who provide similar services, to be paid on a contingency fee basis, rather than keeping detailed time records similar to those customarily kept by attorneys. Therefore, the Debtor submits that requiring CBRE to file periodic fee applications pursuant to sections 330 and 331 of the Bankruptcy Code is unnecessary because CBRE will not be paid unless and until it sells the Property for the Debtor.

18.     As noted above, CBRE's compensation will not be calculated and paid based on the number of hours CBRE expends providing the Services to the Debtor. Therefore, CBRE requests that it be excused from filing time records.  CBRE will, however, file a final fee application in accordance with applicable Bankruptcy Rules, Local Rules and any orders entered by the Court.

19.     Based on the foregoing, the Debtor submits that the relief requested is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

## CBRE'S DISINTERESTEDNESS

20.     To the best of the Debtors' knowledge, CBRE and its employees do not have any connection with or any interest adverse to the Debtors, their creditors, or any other party in interest, or their respective attorneys and accountants, except as may be set forth in the Senese Declaration.

21.     CBRE has represented to the Debtor that it has not provided and will not provide services to any parties other than the Debtor in these cases or in conjunction with any matters that would be adverse to the Debtor arising from, or related to, the Chapter 11 case. CBRE has further represented to the Debtor that neither it, nor its employees, have any connection to the U.S. Trustee or any person employed in the Office of the U.S. Trustee in the Western District of Texas.

22.     Based on the Senese Declaration, the Debtor believe that CBRE is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code. The Debtor has been informed that CBRE will conduct an ongoing review of its files to ensure that no disqualifying circumstances arise, and if any new relevant facts or relationships are discovered, CBRE will supplement its disclosure to this Court.

23.     The Debtor's retention of CBRE pursuant to the terms and conditions set forth herein is necessary and in the best interests of the Debtor, its creditors and its estate.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests entry of an order authorizing the retention of CBRE as real estate broker for the Debtor in accordance with the terms and conditions set forth in the Exclusive Sales Listing Agreement, effective as of the Petition Date, and grant the Debtor such other and further relief as is just and proper.

Respectfully submitted this the 13th day of October, 2015.

THE LAW OFFICES OF RAY BATTAGLIA, PLLC.
66 Granburg Circle
San Antonio, Texas 78218
Telephone (210) 601-9405
Email: rbattaglialaw@outlook.com

By: /s/ Raymond W. Battaglia
      Raymond W. Battaglia
      Texas Bar No. 01918055

ATTORNEYS FOR FPMC SAN ANTONIO REALTY PARTNERS, LP,

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 13th day of October, 2015, a true and correct copy of the following pleading:

**DEBTOR'S APPLICATION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 327(a) AND 328 AUTHORIZING EMPLOYMENT AND RETENTION OF CBRE, INC. AS REAL ESTATE BROKER FOR THE DEBTOR EFFECTIVE AS OF THE PETITION DATE**

has been served upon the parties listed on the Court's ECF transmission list in this case via ECF e-notice or United States Postal Service and on the following parties:

**Time Warner Cable**
Box 60074
City of Industry, CA 91716

**San Antonio Water System**
PO Box 2990
San Antonio, TX 78299

**Texas Capital Bank, N.A.**
c/o James G. Rea, Esq.
McGuire, Craddock & Strother, P.C.
2501 N. Harwood, Suite 1800
Dallas, TX 75201

**Thyssen Krup Elevator Americas**
3660 Thousand Oaks, Suite 210
San Antonio, TX 78247

**Acme Safe & Lock Company**
138 Kenley Pl.
San Antonio, TX 78232

**Andrew Zaragoza**
525 Oak Ctr, Ste 240
San Antonio, TX 78258

**CPS Energy**
PO Box 2678
San Antonio, TX 78289

**DMI Technologies**
14900 Grand River Rd. Suite 100
Fort Worth, TX 76155

**Drash Contracting Company**
1045 Central Parkway N., Suite 101
San Antonio, TX 78258

**Fresenius**
920 Winter Street

**Waste Management**
PO Box 660345
Dallas, TX 75266

**Texas Capital Bank, N.A.**
c/o J. Mark Chevallier, Esq.
McGuire, Craddock & Strother, P.C.
2501 N. Harwood, Suite 1800
Dallas, TX 75201

**Texas Capital Bank, NA**
Bruce A. Shilcutt
2000 McKinney Avenue, Suite 500
Dallas, TX 75201

**Alamo Handyman, LLC**
PO Box 681892
San Antonio, TX 78268

**Bexar County Tax Assessor Collector**
P.O. Box 2903
San Antonio, TX 78299-2903

**DFW Maintenance**
101 St. Louis Avenue
Fort Worth, TX 76104

**Dr. Siraj Sayeed**
5510-B Presidio Parkway
San Antonio, TX 78249

**Forest Park Medical Center at San Antoni**
Central Expressway Suite #440
Dallas, TX 75243

**Gilbert Aguilar**
525 Oak Ctr, Ste 240
San Antonio, TX 78258

**Internal Revenue Service**
Centralized Insolvency Office

Attn: Legal Department
Waltham, MA 02451

**ICON Ecological Solutions**
5432 Bridgeport Rd
McKinney, TX 75071

**J.W. Dielmann, Inc.**
4019 Stahl Road, Suite 118
San Antonio, TX 75701

**Lincoln Harris**
6688 N Central Expwy, #300
Dallas, TX 75206

P.O. Box 7346
Philadelphia, PA 19101-7346

**KNJ Graphix**
2201 Long Prairie Rd, Ste 107/163
Flower Mound, TX 75022

**Mutual Sprinklers**
12000 Crownpoint, Suite 175
San Antonio, TX 75206

**NRG Property Management**
3030 Olive Street, Suite 220
Dallas, Texas 78299

*/s/ Raymond W. Battaglia*
Raymond W. Battaglia

# EXHIBIT 1

| | | |
|---|---|---|
| IN RE: | § | |
| | § | BANKRUPTCY NO. 15-52462-CAG |
| FPMC SAN ANTONIO REALTY | § | |
| PARTNERS, LP, | § | CHAPTER 11 PROCEEDING |
| | § | |
| DEBTOR | § | |

## DECLARATION OF SCOTT SENESE IN SUPPORT OF THE APPLICATION OF THE CHAPTER 11 DEBTOR AUTHORIZING EMPLOYMENT AND RETENTION OF CBRE, INC. AS REAL ESTATE BROKER FOR THE DEBTOR EFFECTIVE AS OF THE PETITION DATE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

Scott Senese, declares the following under penalty of perjury:

1.      I am Senior Managing Director of CBRE, Inc. ("CBRE") which maintains an office at 100 Congress Avenue, Suite 5500, Austin, Texas 78701.

2.      I am authorized to execute this Declaration on behalf of CBRE, and submit this Affidavit pursuant to Sections 327(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") in support of the application (the "Application") of the above-captioned case (the "Debtor")  to employ and retain CBRE to serve as the Debtor's real estate broker as set forth in the Application and the Exclusive Sale Listing Agreement. Except as otherwise indicated, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

## A. Scope of Services

3. The Broker will perform services for the Debtor, upon the request of the Debtor, as set forth in the Exclusive Sale Listing Agreement, including, but not limited to, the following:

    a. marketing the Property;

    b. assistance with negotiations regarding any potential transactions involving the Property;

    c. analysis of and recommendations regarding offers for transactions involving the Property; and

    d. assistance with consummation of any transactions involving the Property

**B. Professional Compensation**

4. The Exclusive Sale Listing Agreement provides that CBRE shall be paid a commission, due in full at the time of closing or transfer of title to the Property, of (i) 1.00% of the gross sales price; however, if the Property is purchased by either Amicus Interests, LLC or OnPointe Health Development LLC, or any of their affiliates, the commission will be thirty three hundredths of a percent (0.33%) of the gross sale price.

5. CBRE's compensation is results-oriented and directly related to benefits received by the Debtor's estate. CBRE will not be compensated based upon time and effort expended. Instead, CBRE will be compensated based upon a percentage of the proceeds of any transactions relating to the Property. Recording and submission of detailed time entries for services rendered in these cases is unnecessary and would be unduly burdensome to CBRE.

6. The description of the services listed herein is a summary. To the extent that this Application and the terms of the Exclusive Sale Listing Agreement are inconsistent, the terms of the Exclusive Sale Listing Agreement shall control.

7. To date, CBRE has been paid $0.00 by the Debtors in connection with this matter.

C. Disinterestedness and Eligibility

8.      In connection with the preparation of this affidavit, CBRE conducted a review of its contacts with the Debtor, and certain entities holding large claims against or interests in the Debtos that were made reasonably known to CBRE. CBRE's review, completed with my assistance, consisted of a query of the creditors of the Debtor within an internal computer database containing names of individuals and entities that are present or recent former clients of CBRE. Based on the results of its review, while CBRE may have had a business relationship over the last year with the certain parties identified, CBRE does not have a relationship with any of the parties in matters related to these proceedings.

9.      Further, as part of its diverse practice, CBRE appears in numerous cases, proceedings and/or transactions that involve many different professionals, including attorneys, accountants and financial consultants, who may represent claimants and parties-in- interest in the Debtor's Chapter 11 case. Also, CBRE has performed in the past, and may perform in the future, advisory consulting services for various parties, some of whom may be involved in these proceedings. In addition, CBRE has in the past, may currently and will likely in the future be working with or against other professionals involved in this case in matters unrelated to the Debtors and these cases. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interests materially adverse to the Debtors in matters upon which CBRE is to be employed, and none are in connection with this case.

10.     CBRE is not a "creditor" within the meaning of Section 101(10) of the Bankruptcy Code. Further, neither I nor any other member of the CBRE engagement team serving the Debtor, to the best of my knowledge, is a holder of any outstanding debt instruments or other equity interests or securities of the Debtor.

11. As such, to the best of my knowledge, CBRE is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that CBRE:

    a. is not a creditor, equity security holder or insider of the Debtor;

    b. is not and was not an investment banker for any outstanding security of the Debtor;

    c. has not been, within three years before the date of the filing of the Debtor's Chapter 11 petition, (i) an investment banker for a security of the Debtor or (ii) an attorney for such an investment banker in, connection with the offer; sale, or issuance of a security of the Debtor; and

    d. was not, within two years before the date of filing of the Debtor's Chapter 11 petition, a director, officer, or employee of the Debtor or of any investment banker as specified in subparagraph (b) or (c) of this paragraph.

12. In addition, to the best of my knowledge and based upon the results of the relationship search described above and disclosed herein, CBRE neither holds nor represents an interest adverse to the Debtor within the meaning of Section 327(a) of the Bankruptcy Code.

13. It is CBRE's policy and intent to update and expand its ongoing relationship search for additional parties in interest in an expedient manner. If any new material relevant facts or relationships are discovered or arise, CBRE will promptly file a Bankruptcy Rule 2014(a) Supplemental Affidavit.

14. In accordance with section 504 of the Bankruptcy Code, I hereby state that there is no agreement or understanding between CBRE and any other entity, other than a partner or an

14.     In accordance with section 504 of the Bankruptcy Code, I hereby state that there is no agreement or understanding between CBRE and any other entity, other than a partner or an associate of CBRE, for the sharing of compensation received or to be received for services rendered in connection with these proceedings.

15.     This Affidavit is provided in accordance with Section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

FURTHER AFFIANT SAYETH NOT.


Executed this the 13rd of October, 2015



Scott Senese


SUBSCRIBED and SWORN to before me, the undersigned authority, on this the 13th day of October, 2015.

JENNIFER L FAHLSING
Notary Public, State of Texas
My Commission Expires
December 18, 2017

Notary Public

My Commission Expires: 12/18/17

# EXHIBIT 2

**CBRE**

CBRE, INC.
BROKERAGE AND MANAGEMENT
LICENSED REAL ESTATE BROKER

1.  In consideration of the listing for sale the real property hereinafter described (the "**Property**") by **CBRE, INC.** ("**Broker**"), and Broker's agreement to use its best efforts to effect a sale of same and to assist the undersigned ("**Owner**") in maximizing the value to be obtained through the timely sale of the Property, Owner hereby grants to Broker the exclusive right to sell the Property for a period commencing October 1, 2015, and ending midnight, April 30, 2016 (the "**Term**"), unless sooner terminated in accordance with the provisions of this Agreement, upon the following terms:

    The Property is situated in the City of San Antonio, County of Bexar, State of Texas, and is further described as the Forest Park Medical Center Hospital and Medical Office Building located at 5510 Presidio Parkway. References herein to the Property shall be understood to include portions of the Property; provided, however, that the establishment or termination of any obligations of Broker or Owner related to the sale of the Property shall be understood only to relate to the sale of the entire Property and not to any portion thereof that is less than the whole unless agreed otherwise in writing by Owner.

2.  Broker hereby represents that it and the Listing Team (as defined below), to the extent required by law, are duly licensed to provide the services prescribed in this Agreement. Broker shall, at its expense, obtain and keep in full force and effect throughout the Term of this Agreement all licenses and permits required to be maintained by Broker in connection with the rendering of the services prescribed in this Agreement.

3.  Broker's Representation and Duties.

    a.  Broker shall perform the services through able, qualified and trained personnel of Broker, including, without limitation, supervisory and support personnel, in sufficient number, in Broker's reasonable opinion, to properly render the services in the manner appropriate for the Property as required by this Agreement. Broker shall have the exclusive right to hire, direct, discipline, compensate and terminate the personnel of Broker, and shall exercise complete and exclusive control over the conduct of Broker's personnel. Such services shall include:

        i.   Broker shall review the Property to determine its physical condition, relative market appeal, quality of location, market and area trends, and potential for value enhancement prior to entering the market. Broker shall conduct an independent review of the Property's financial performance, including an analysis of historical performance, market area, competition and project cash flows. Broker shall review all leases, management agreements and operating agreements, or other documents affecting the Property which are delivered to Broker by Owner.

        ii.  Broker shall expose the property to a wide variety of purchasers via direct mail, print advertising and on the Internet, as deemed appropriate by Broker. Broker shall provide prospective purchasers with additional information and coordinate site visits. Broker shall not disseminate any offering brochures or other written promotional materials, until approved by Owner in writing.

        iii. Broker shall solicit and identify prospective purchasers of the Property, deliver the offering materials to such prospective purchaser and, in connection therewith, assist Owner in qualifying prospective purchasers prior to recommending acceptance of an offer, provided, however, that Owner shall have the ultimate responsibility for determining the financial condition and capabilities of any prospective purchaser. Broker shall request each prospective purchaser to execute and deliver to Broker a confidentiality agreement, if required by Owner and on Owner's form agreement. Broker shall make the necessary arrangements with Owner or Owner's agent to permit prospective purchasers to physically inspect the Property.

        iv.  Broker shall promptly inform Owner of all offers and inquiries received from brokers, prospective purchasers or anyone else with respect to the Property.

        v.   All negotiations with prospective purchasers shall be conducted by Broker in conjunction with Owner and Owner's counsel. Owner and its counsel will be responsible for determining the legal sufficiency of the purchase and sale agreement and other documents relating to any transaction contemplated by this Agreement.

        vi.  Broker shall assist Owner and Owner's counsel in the preparation and execution of the closing checklist and closing documentation, and shall coordinate with the property manager for the Property to secure all documents and information required for closing.

b.  Broker's listing team for purposes of implementing the obligations of Broker hereunder shall consist of Chris Bodnar, Scott Herbold and Lee Asher (the "**Listing Team**"). The Listing Team shall assume primary responsibility for the initiation of all discussions and the conduct of all negotiations with prospective purchasers on the part of Broker. Broker may replace any member of the Listing Team during the Term in the event a member of the Listing Team dies, becomes incapacitated or terminates his/her employment with Broker, provided such replacement individual has similar or greater experience than the replaced member and provided that Owner consents, which consent shall not be unreasonably withheld. Upon written request by Owner, any member of the Listing Team shall be replaced by another qualified salesperson employed by Broker, subject to Owner's approval, which approval shall not be unreasonably withheld.

c.  With mutually agreed upon frequency, Broker shall submit to Owner marketing reports on the status of the marketing of the Property which shall include an updated list of all prospective purchasers and a summary of the status of any offers or negotiations.

d.  As used in this Agreement, the term "**Confidential Information**" means any information provided by Owner to Broker except that Confidential Information does not include information that (i) was publicly available at the time it was provided by Owner or thereafter becomes publicly available without breach by Broker of its obligations hereunder, (ii) becomes available to Broker on a non-confidential basis from a source other than Owner or its representatives, and (iii) is required by law to be disclosed.

    For a period of one (1) year from the date of disclosure of any Confidential Information to Broker, Broker agrees to hold such Confidential Information in trust and confidence for Owner, and agrees not to use Confidential Information other than as required in the performance of its obligations under this Agreement, which shall include disclosure to Broker's personnel who have a need to know.

e.  The Listing Team shall solicit and cooperate with other licensed real estate brokers, including licensed real estate brokers employed by or licensees of Broker, excluding the Listing Team (a "Cooperating Broker"), who are authorized to represent prospective purchasers for the Property. Broker shall not be required to share its fee or commission with any Cooperating Broker, and shall not be responsible for payment of any Cooperating Broker fee or commission due and payable as a result of a sale of the Property. Any such Cooperating Broker fee, commission or other compensation shall be the responsibility of the purchaser. Broker shall not be obligated to provide any marketing materials or other information to any Cooperating Broker representing a prospective purchaser unless such Cooperating Broker (i) represents the prospective purchaser pursuant to a written agreement, a copy of which is furnished to Broker, (ii) executes and delivers to Broker a confidentiality agreement, if required by Owner and on Owner's form, and (iii) executes and delivers written confirmation that neither Broker nor Owner will be responsible to pay any Cooperating Broker fee, commission or other compensation unless Owner otherwise agrees in writing (provided Owner is under no obligation to so agree).

4.  Notwithstanding any designation of Broker as "agent" in this Agreement, Broker shall have no right, power or authority to enter into any agreement with any prospective purchaser, real estate broker or any other person in the name of, on behalf of, or otherwise binding upon Owner, nor may Broker create any other obligations or liabilities binding on Owner, except as otherwise provided by applicable law.

5.  Owner agrees to pay Broker a sales commission when such commission is earned and payable in accordance with Broker's Schedule of Sale Commissions (the "**Schedule**"), a copy of which is executed by Owner, attached hereto and hereby made a part hereof, and the terms and conditions of this agreement. This commission shall be earned for services rendered if, during the Term the Property is sold to a purchaser procured by Broker, Owner or anyone else.

6.  Owner further agrees that Owner shall pay Broker an earned commission in accordance with the Schedule if, within one hundred twenty (120) calendar days after the expiration or termination of the Term, the Property is sold to, or Owner enters into a contract of sale of the Property with, or negotiations continue, resume or commence and thereafter continue leading to a sale of the Property to any person or entity (including his/her/its successors, assigns or affiliates) with whom Broker has negotiated (either directly or through another broker or agent) or to whom the Property has been submitted prior to the expiration or termination of the Term. Broker agrees to submit a list of such persons or entities to Owner no later than fifteen (15) calendar days following the expiration or termination of the Term, provided, however, that if a written offer has been submitted then it shall not be necessary to include the offeror's name on the list. Unless otherwise notified in writing by Owner, Broker is authorized to continue negotiations with such persons or entities.

7.  Commissions shall be payable hereunder when earned, which will occur upon the closing of sale or closing of the transaction as set forth in Section 5. In the event the sale of the Property fails to close for any reason whatsoever, including Owner's default,

Broker shall not be entitled to any fee, commission or other compensation except for the expenses as set forth in Section 27 of this Agreement.

8.  The terms of sale shall be on an "all cash" basis or such other terms and conditions as are acceptable to Owner in its sole and absolute discretion. Any offer may contain normal and customary contingencies such as those relating to the condition of the Property, title report, and timing of closing which are acceptable to Owner in its sole and absolute discretion.

9.  Owner and Broker agree that the Property will be offered in compliance with all applicable anti-discrimination laws.

10. Owner agrees to cooperate with Broker in bringing about a sale of the Property and to refer immediately to Broker all inquiries of anyone interested in the Property. All negotiations are to be through Broker. Broker is authorized to accept a deposit from any prospective purchaser and to handle it in accordance with the instructions of the parties unless contrary to applicable law.

11. Owner reserves the right, in all events and in Owner's sole and absolute discretion, to approve, modify or disapprove any and all proposals and offers regarding pricing, marketing and terms of sale of the Property, and to approve or reject any prospective purchaser. Owner reserves the right to adjust the terms and conditions of any offer made or received, including, but not limited to, adjustment of the offering price for the Property upward or downward.

12. In the event the Property is removed from the market due to the opening of an escrow or acceptance of an offer to purchase the Property during the Term, or any extension thereof, and the sale is not consummated for any reason then, in that event, the Term shall be extended for a period of time equal to the number of days that the escrow had been opened and/or the Property had been removed from the market, whichever is longer, provided that, in no event shall such extension(s) exceed one hundred eighty (180) calendar days in aggregate.

13. Owner may, by written notification to Broker, at any time in its sole and unfettered discretion, remove the Property from the market, in which event Owner shall be responsible to pay to Broker its expenses, in accordance with Section 27 of this Agreement.

14. Owner, at any time during the Term of this Agreement, for any or no reason, in its sole and unfettered discretion, may terminate this Agreement by providing Broker with thirty (30) days' prior written notice, in which event, Owner shall be responsible to pay to Broker its expenses, in accordance with Section 27 of this Agreement.

15. Owner shall have the right to terminate this Agreement upon not less than ten (10) day's prior written notice to Broker in the event of a material breach or default by Broker of any of its obligations hereunder, unless prior to the end of such ten (10) day period Broker has remedied such breach or default to Owner's reasonable satisfaction. The notice shall specify with particularity the material breach or default with respect to which the notice is given. In the event of Broker's fraud, negligence or intentional breach of this Agreement, upon termination or suspension of Broker's real estate brokerage license or any other license or governmental requirement, or upon the bankruptcy or insolvency of Broker, Owner shall have the right to immediately terminate this Agreement in its sole and absolute discretion upon written notice to Broker. Upon any such termination in this Section 15, Owner shall have no obligation for the payment of any fees or commissions to broker, or the reimbursement of any expenses incurred by Broker (including, without limitation, the reimbursements set forth in Section 27 of this Agreement).

16. Owner agrees to disclose to Broker and to prospective purchasers any and all information which Owner has regarding present and future zoning and environmental matters affecting the Property and regarding the condition of the property, including, but not limited to structural, mechanical and soils conditions, the presence and location of asbestos, PCB transformers, other toxic, hazardous or contaminated substances, and underground storage tanks, in, on, or about the Property. Broker is authorized to disclose any such information to prospective purchasers.

17. Owner represents that it is the owner of the Property and that, except as may be set forth in an addendum attached hereto, to Owners current and best knowledge no person or entity who has an ownership interest in the Property is a foreign person as defined in the Foreign Investment in Real Property Tax Act (commonly known as "**FIRPTA**").

18. Owner hereby acknowledges receipt from Broker of the agency disclosure form entitled "Information on Brokerage Relationships." Owner acknowledges that Broker is a national and international real estate services company and that in some cases it may represent prospective purchasers. Owner desires that the Property be presented to such persons or entities and will consent to the dual representation created thereby as long as:
a.  **Broker notifies Owner in writing prior to undertaking any dual representation;**
b.  **Broker does not disclose to the buyer that Owner will accept a price less than the asking price unless otherwise instructed in a separate writing by Owner;**

c. Broker does not disclose to Owner that the buyer will pay a price greater than the price submitted in a written offer to Owner unless otherwise instructed in a separate writing by the buyer;

d. Broker does not disclose any confidential information or any information a party specifically instructs Broker in writing not to disclose unless otherwise instructed in a separate writing by the respective party or required to disclose such information by The Texas Real Estate License Act or a court order or if the information materially relates to the condition of the Property;

e. Broker treats all parties to the transaction honestly;

f. Broker complies with The Texas Real Estate License Act; and

g. The Listing Team does not represent the buyer.

Broker shall not disclose any confidential information of one principal to the other.

19. In the event that the Property comes under the jurisdiction of a bankruptcy court, Owner shall immediately notify Broker of the same, and shall promptly take all steps necessary to obtain court approval of Broker's appointment, unless Broker shall elect to terminate this Agreement upon said notice.

20. In the event that the Property becomes the subject of foreclosure proceedings prior to the expiration of this Agreement, then this Agreement shall be deemed suspended until such time as Owner may reacquire the Property within the Term. If this Agreement is suspended pursuant to this Section 20, Broker shall be free to enter into a listing agreement with any receiver, the party initiating the foreclosure, the party purchasing the Property at a foreclosure sale, or any other person having an interest in the Property.

21. Broker agrees to indemnify and defend Owner from and against all liability, damages, losses and expenses resulting from claims or causes of action by a third party (collectively, "**Claims**") based solely upon Broker's negligent acts or omissions. Such obligation to defend and indemnify will not apply, however, if the claim or cause of action is based upon or arises in any way out of an act, failure to act or representation of Owner or any agent of Owner, including, but not limited to, Owner providing to Broker incorrect information or failing to disclose to Broker information which should have otherwise been disclosed to such claimant or to Broker. Broker will have the sole and absolute right to select and employ an attorney or attorneys to defend against such Claim and Owner will cooperate with Broker and its attorneys.

If Owner notifies Broker of any Claim for which Owner and Broker do not dispute that Owner is entitled to indemnification pursuant to this Section 21, Broker shall, within fifteen (15) days following receipt of such notice, notify Owner whether it will assume defense of such Claim, assume defense of such Claim with a reservation of rights, or reject defense of such claim. If Broker fails or refuses to defend such Claim or fails to timely give the notice required by this section, Owner shall then have the right to employ counsel at the expense of Broker. If Broker assumes the defense with a reservation of rights, Owner shall have the right to employ counsel at its expense and participate in the defense with the full cooperation of Broker. With respect to any Claim for which Broker assumes defense without a reservation of rights, Broker shall have the right to defend such action, employ counsel of its choice, and negotiate and carry out any settlement of such action. Notwithstanding the foregoing, Broker shall not, without the prior written consent of Owner, (a) settle or compromise any Claim or consent to the entry of any judgment in which Broker receives a more comprehensive release or hold harmless than Owner, provided that such settlement, compromise or judgment shall not affect the continuing obligation of Broker to indemnify Owner hereunder; or (b) settle or compromise any action, suit, proceeding or claim in any manner that may adversely affect Owner or obligate Owner to pay any sum or perform any obligation.

22. In the event of any dispute between Owner and Broker relating to this Agreement, the Property or Owner or Broker's performance hereunder, Owner and Broker agree that such dispute shall be resolved by means of binding arbitration and judgment upon the award rendered by the arbitrator(s) may be entered in any court of competent jurisdiction. A single arbitrator engaged in the practice of law who is knowledgeable about the subject matter of this Agreement shall conduct the arbitration under the then current rules of the American Arbitration Association (the "**AAA**"). The arbitrator shall be selected in accordance with AAA procedures from a list of qualified people maintained by the AAA but shall have no pre-existing relationship with either party or its affiliates. The arbitration shall be conducted in the regional AAA office closest to where the claim arose, and all expedited procedures prescribed by the AAA rules shall apply. Depositions may be taken and other discovery obtained during such arbitration proceedings to the same extent as authorized in civil judicial proceedings in the state where the office of Broker executing this Agreement is located. The arbitrator(s) shall be limited to awarding compensatory damages and shall have no authority to award punitive, exemplary or similar type damages. The prevailing party in the arbitration proceeding shall be entitled to recover its expenses, including the costs of the arbitration proceeding, and reasonable attorneys' fees.

23. In the event that Owner lists the Property with another broker after the expiration or termination of this Agreement, Owner agrees to provide in the subsequent listing agreement that a commission will not be payable to the new broker with respect to transactions for which Owner remains obligated to pay a commission to Broker under Section 6 hereof. Owner's failure to do so, however, shall not affect Owner's obligation to Broker under Section 6.

24. Each signator to this Agreement represents and warrants that he or she has full authority to sign this Agreement on behalf of the party for whom he or she signs and that this Agreement binds such party.

25. This Agreement constitutes the entire agreement between Owner and Broker and supersedes all prior discussions, negotiations and agreements, whether oral or written. No amendment, alteration, cancellation or withdrawal of this Agreement shall be valid or binding unless made in writing and signed by both Owner and Broker. This Agreement shall be binding upon, and shall benefit, the heirs, successors and assignees of the parties. In the event any clause, provision, paragraph, section or term of this Agreement shall be deemed to be unenforceable or void based on any controlling state or federal law, the remaining provisions hereof, and each part, shall remain unaffected and shall continue in full force and effect.

26. The parties hereto agree to comply with all applicable federal, state and local laws, regulations, codes, ordinances and administrative orders having jurisdiction over the parties, property or the subject matter of this Agreement, including, but not limited to, the 1964 Civil Rights Act and all amendments thereto, the Foreign Investment in Real Property Tax Act, the Comprehensive Environmental Response Compensation and Liability Act, and The Americans With Disabilities Act.

27. Owner shall reimburse Broker for its reasonable, necessary, actual and out of pocket cost incurred in connection with performing the services described herein, provided that any such costs incurred shall not exceed the sum of $5,000. Such expenses shall include marketing, travel, financial analysis, professional photography, redrawing of floor plans and site plans, which may be invoiced by Broker from time to time and shall be paid within thirty (30) days of receipt of an invoice. Broker at, at their option, can utilize either a 3rd party firm for ARGUS modeling or Broker's Financial Consulting Group, both of which shall be considered out-of-pocket expenses.

28. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties hereto and their successors or assigns, any rights or remedies under or by reason of this Agreement.

[Remainder of Page Intentionally Left Blank]

The undersigned Owner hereby acknowledges receipt of a copy of this Agreement and the Schedule.

Accepted:

**CBRE, Inc.**

License Real Estate Broker

| | |
|---|---|
| By: | _(signature)_ |
| Name: | Scott Senese |
| Title: | Senior Managing Director |
| Address: | 100 Congress Avenue, Suite 500 |
| | Austin, TX 78701 |
| Telephone | (512) 499.4912 |

**FPMC SAN ANTONIO REALTY PARTNERS,
a Texas Limited Partnership**
Owner

| | |
|---|---|
| By: | _(signature)_ |
| Name: | Todd Furniss |
| Title: | Manager |
| Address: | 3030 Olive Street, Suite 220 |
| | Dallas, Tx 75219 |
| Telephone | (214) 754-0013 |

**CONSULT YOUR ADVISORS** - This document has legal consequences. No representation or recommendation is made by Broker as to the legal or tax consequences of this Agreement or the transaction(s) which it contemplates. These are questions for your attorney and financial advisors.



## SCHEDULE OF SALE COMMISSIONS

CBRE, INC.
BROKERAGE AND MANAGEMENT
LICENSED REAL ESTATE BROKER

FOR PROPERTY LOCATED at 5510 Presidio Parkway, San Antonio, Texas 78249. Broker's commission will be one percent (1.00%) of the gross sales price; provided, however, if the Property is purchased by either Amicus Interests, LLC or OnPointe Health Development LLC, or any of their affiliates, the Broker's commission will be thirty three hundredths of a percent (0.33%) of the gross sales price. Gross sales price shall include any and all consideration received or receivable, in whatever form, including but not limited to assumption or release of existing liabilities. This commission shall be paid at the closing per the Agreement. In the event Owner contributes or conveys the Property or any interest therein to a joint venture, partnership, or other business entity, which is not a majority owned affiliate of the owner, the commission shall be calculated on the fair market value of the Property, less the value of the interest in the Property retained by or transferred to Owner, as the case may be, and shall be paid at the time of the contribution or transfer. If Owner is a partnership, corporation or other business entity, and an interest in the partnership, corporation or other business entity is transferred, whether by merger, outright purchase, or otherwise, in lieu of a sale of the Property, and applicable law does not prohibit the payment of a commission in connection with such sale or transfer, the commission shall be calculated on the fair market value of the Property, rather than the gross sales price, multiplied by the percentage of interest so transferred, and shall be paid at the time of the transfer. Howerver, if the property is transferred to an entity that is majority owned affiliated with the owner, no commission will be earned or due.

The provisions hereof are subject to the terms and provisions of any Exclusive Sales Listing Agreement, or other agreement to which this Schedule may be attached and which is executed by the parties hereto.

In the event Owner fails to make payments within the time limits set forth herein, then from the date due until paid the delinquent amount shall bear interest at the maximum rate permitted in the state in which the office of the Broker executing this Schedule is located. If Broker is required to institute legal action against Owner relating to this Schedule or any agreement of which it is a part, Broker shall be entitled to reasonable attorneys' fees and costs.

Owner hereby acknowledges receipt of a copy of this Schedule and agrees that it shall be binding upon its heirs, successors and assignees. In the event Owner sells or otherwise disposes of its interest in the Property, Owner shall remain liable for payment of the commissions provided for in this Schedule and any agreement of which it is a part. Capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to such terms in the Exclusive Sales Listing Agreement to which this Schedule is attached.

Accepted:

**CBRE, Inc.**

License Real Estate Broker

| | |
|---|---|
| By: | |
| Name: | Scott Senese |
| Title: | Senior Managing Director |
| Address: | 100 Congress Avenue, Suite 500 |
| | Austin, TX 78701 |
| Telephone | (512) 499.4912 |

**FPMC SAN ANTONIO REALTY PARTNERS,**
**a Texas Limited Partnership**
Owner

| | |
|---|---|
| By: | |
| Name: | Todd Furniss |
| Title: | Manager |
| Address: | 3030 Olive Street, Suite 220 |
| | Dallas, TX 75219 |
| Telephone | (214) 754-0013 |