# EXHIBIT A

## SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION
## LOAN AND SECURITY AGREEMENT

THIS SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT (as amended, modified, or restated from time to time, this "*Agreement*") dated as of October [___], 2015 (the "*Effective Date*"), is between **TEXAS CAPITAL BANK N.A.**, a national banking association (together with its successors and assigns, "*DIP Lender*" or "*Lender*"), and **FPMC SAN ANTONIO REALTY PARTNERS LP**, a debtor-in-possession and on behalf of the bankruptcy estate created by 11 U.S.C. §541 in the Case (the "*Estate*") entitled FPMC San Antonio Realty Partners LP, Case No. 15-52462 (collectively, "*Debtor-in-Possession*" or "*Debtor*").

## RECITALS

WHEREAS, on October 6, 2015 ("*Petition Date*"), Debtor commenced a case ("*Bankruptcy Case*") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101, *et seq.* (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the "*Bankruptcy Court*"). Debtor has retained possession of its assets and is authorized under the Bankruptcy Code to continue to operate its business as a debtor in possession.

WHEREAS, prior to the Petition Date, Texas Capital Bank ("*Texas Capital Bank*"); American Bank of Texas; Prosperity Bank; Viewpoint Bank, N.A.; Stearns Bank National Association; Liberty Capital Bank; and Texas Heritage Bank (the "*Prepetition Lenders*") made a construction loan to Debtor under various pre-Petition Date loan documents ( "*Construction Loan*").

WHEREAS, Texas Capital Bank serves as Administrative Agent to the Prepetition Lenders in connection with the Construction Loan.

WHEREAS, on _____, 2015, the Bankruptcy Court entered an *Interim Order (i) Authorizing Debtor to Obtain Postpetition Financing on a Senior Secured Superpriority Basis Pursuant to §§105, 361, 362, 363, and 364 of the Bankruptcy Code and (ii) Granting Related Relief* ("*Interim Order*").

WHEREAS, Debtor has requested that Lender provide a debtor-in-possession loan to Debtor in an aggregate principal amount not to exceed FIVE MILLION AND NO/100 DOLLARS ($5,000,000) (the "*DIP Loan*"), available in multiple Advances, the aggregate proceeds of which shall be used only as provided in the Budget.

WHEREAS, Lender has indicated its willingness to extend the Loan to Debtor, all on the terms and conditions set forth herein and in the other Loan Documents and in accordance with the Bankruptcy Code, so long as, among other things, such postpetition loan obligations are (i) secured by Liens on all of the property and interests, real and personal, tangible and intangible, of Debtor, whether now owned or hereafter acquired, as set forth herein, and subject in priority only to the Carve Out, and (ii) given superpriority status as provided in the Orders.

WHEREAS, Lender has agreed to provide the Loan made pursuant to this Agreement with the express understanding that Debtor has agreed to the superpriority status and liens subject to approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements herein contained, the sufficiency of which hereby is acknowledged, the parties hereto represent and agree as follows:

1.      **Definitions**.  As used in this Agreement, all exhibits, appendices, and schedules hereto, and in any Loan Document made or delivered pursuant to this Agreement, unless otherwise defined in the Agreement, the following terms will have the meanings given such terms in this Section 1:

"*Additional Advance*" means any advance of Loan Proceeds made by Lender, in its sole and absolute discretion, to Debtor under this Agreement after the Initial Advance.

"*Advance*" means an advance of Loan Proceeds made by Lender, in its sole and absolute discretion, to Debtor under this Agreement.

"*Affiliate*" means, with respect to a specified Person, another Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"*Aggregate Commitment*" means the maximum amount to potentially be loaned by the Lender, in its sole and absolute discretion, to the Debtor-in-Possession from time to time pursuant to a Budget.  The Aggregate Commitment as of the Closing Date is FIVE MILLION AND NO/100 DOLLARS ($5,000,000); provided, however, in no event shall the Aggregate Commitment exceed the principal amount of the Loan approved by the Bankruptcy Court pursuant to the then-effective Order.

"*Asset Sale*" With respect to any Person, the sale, lease, conveyance, disposition or other transfer by such Person of any of its assets (including by a sale-leaseback transaction and including the sale or other transfer of any of the equity interests or membership interests of subsidiary of such Person).

"*Budget*" means the cash-flow and expenditure projections prepared from time to time by Debtor and approved by the Lender in its sole and absolute discretion, showing any and all anticipated cash receipts and disbursements on a rolling four-week basis, together with any amendments, modifications, or updates to such projections; provided, however, that no such projections, amendments, modifications, or updates shall constitute the Budget until (and only to the extent) the same has been approved by Lender in its sole and absolute discretion.  The initial Budget (which has been approved by Lender) is attached hereto as **Exhibit A** and covers only through November 2, 2015.  For the avoidance of doubt, any requests of the Debtor-in-Possession for funding under this Agreement beyond the initial Budget must be made in writing to the Lender with a new Budget.  Lender has sole and absolute discretion to approve or reject any such request.

"*Business Day*" means any day other than a Saturday, Sunday, or any other day on which the Federal Reserve Bank of Dallas, Texas, is closed.

"*Carveout*" means (a) allowed administrative expenses pursuant to 28 U.S.C. §1930(a)(6), and (b) allowed reasonable fees and expenses of the Case Professionals as provided in the Budget approved by the Lender and incurred prior to the Termination Date, plus an amount up to $20,000 for such fees and expenses incurred after a Termination Date.

"*Case Professionals*" means any and all of the professionals formally retained by the Debtor or any committee of creditors appointed in the Case, as such professionals' employment is formally approved under a final order entered by the Bankruptcy Court in the Case pursuant to Sections 327 and 1103, as applicable, of the Bankruptcy Code.

"*Cash Collateral*" means all cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents now or hereafter in the possession, custody or control of Debtor.

"*Closing Date*" means the calendar date when both of the following conditions precedent have occurred: (a) the Bankruptcy Court has entered the Interim Order; and (b) the Loan Documents have been executed and delivered to Lender, such execution and delivery to occur as promptly as is practical, but in any event not later than three (3) business days after the Bankruptcy Court's entry of the Interim Order.

"*Code*" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of Texas; provided, to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different articles or divisions of the Code, the definition of such term contained in Article 9 shall govern; provided, further, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Lender's lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of Texas, the term "*Code*" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"*Collateral*" means all assets, property, and interests in assets or to property (whether tangible or intangible, real or personal) of Debtor, Debtor-in-Possession, and the Estate, whether now owned or hereafter acquired, whether acquired before or after the Petition Date, other than avoidance actions under §§547 and 548 of the Bankruptcy Code against entities other than Lender.  Notwithstanding and without limiting the foregoing, the term "*Collateral*," as used herein, also includes (a) any other property or assets, real or personal, tangible or intangible, now existing or hereafter acquired, of Debtor, and (b) all **SUPPORTING OBLIGATIONS**, **PRODUCTS**, and **PROCEEDS** of all of the foregoing (including without limitation, insurance payable by reason of loss or damage to the foregoing property) and any property, assets securities, guaranties or monies of Debtor-in-Possession that may at any time come into the possession of Debtor-in-Possession or Lender.  For the avoidance of doubt, causes of action under §549 of the Bankruptcy Code (and the proceeds thereof) are Collateral, and any lien or security interest avoided, recovered, or preserved pursuant to §§550, 551, and/or 552 of the Bankruptcy Code shall have the same priority as such avoided lien.

"*Commitment Fee*" means a fee equal to one percent (1%) of the Aggregate Commitment.

"*Constituent Documents*" means (a) in the case of a corporation, its articles or certificate of incorporation and bylaws; (b) in the case of a general partnership, its partnership agreement; (c) in the case of a limited partnership, its certificate of limited partnership and partnership agreement; (d) in the case of a trust, its trust agreement; (e) in the case of a joint venture, its joint venture agreement; (f) in the case of a limited liability company, its articles of organization or certificate of formation and operating agreement or regulations; and (g) in the case of any other entity, its organizational and governance documents and agreements.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Debt*" means as to any Person at any time (without duplication) all items of indebtedness, obligation or liability of a Person, whether mature or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, that should be classified as liabilities in accordance with GAAP.

"*Default*" means any Event of Default or event that with notice and/or the passage of time would be an Event of Default.

"*Dollars*" and "*$*" mean lawful money of the United States of America.

"*GAAP*" means generally accepted accounting principles, applied on a consistent basis, as set forth in Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants and/or in statements of the Financial Accounting Standards Board and/or their respective successors and which are applicable in the circumstances as of the date in question.  Accounting principles are applied on a "consistent basis" when the accounting principles applied in a current period are comparable in all material respects to those accounting principles applied in a preceding period.

"*Governmental Authority*" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Highest Lawful Rate*" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to Lender or Debtor which are presently in effect or, to the extent allowed by law, under such applicable laws which hereafter may be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"*Indebtedness*" means (a) all indebtedness, obligations and liabilities of Debtor-in-Possession to Lender of any kind or character, now existing or hereafter arising, whether fixed, contingent, liquidated, unliquidated, joint, several or joint and several, under the Note, this Agreement, and the Loan Documents, (b) all accrued but unpaid interest on any of the indebtedness described in (a) above, (c) all obligations of Obligors to Lender under the Loan Documents, (d) all costs and expenses incurred by Lender in connection with the collection of all or any part of the indebtedness and obligations described in (a), (b) and (c) above or the protection or preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations, including without limitation all reasonable attorneys' fees, and (e) all renewals, extensions, modifications and rearrangements of the indebtedness and obligations described in (a), (b), (c) and (d) above.

"*Initial Advance*" means the first Advance of Loan Proceeds made by Lender, in its sole and absolute discretion, to Debtor under this Agreement.

"*Intellectual Property*" means the trade secrets, inventions, processes, designs, plants protected under title 35, patent applications, plant varieties, work of authorship protected under title 17, mask work protected under chapter 9 of title 17, copyrights, copyright licenses, patents, patent licenses, trademarks and trademark licenses now owned or hereafter acquired by Debtor-in-Possession.

"*Interim Availability Amount*" is $_____.

"*Interim Availability Period*" means the period commencing on the date of entry of the Interim Order and ending November 2, 2015.

"*Lenders*" means collectively, the Lender and the Prepetition Lenders.

"*Loan*" means the DIP Loan (as the term "*DIP Loan*" is described and defined the recitals).

"*Loan Documents*" means this Agreement, the Note, and any other agreements, instruments, and documents, acceptable to Lender in its sole and absolute discretion, evidencing, securing, governing, guaranteeing or pertaining to the Loan or any other extension of credit by Lender to Debtor-in-Possession.

"*Loan Proceeds*" All amounts advanced as part of the Loan, whether advanced as part of the Loan to the Debtor-in-Possession or otherwise.

"*Material Adverse Effect*" means a material adverse effect on (a) the business, assets, property, operations, condition (financial or otherwise) or prospects of an Obligor (individually or taken as a whole), (b) any of the rights of or benefits available to Lender under the Loan Documents or (c) the validity or enforceability of the Loan Documents.

"*Note*" means the $5,000,000 **SENIOR SECURED PROMISSORY NOTE** executed and delivered to Lender pursuant to this Agreement, as such may be amended, modified, or restated from time to time.

"*Obligor*" or "*Obligors*" means Debtor, Debtor-in-Possession, the Estate, and any other Person who guaranteed or is otherwise obligated to pay or perform all or any portion of Indebtedness.

"*Order*" means any order of the Bankruptcy Court that (a) has been entered with respect to Debtor-in-Possession's request for authorization to obtain debtor-in-possession, post-petition financing pursuant to this Agreement and grants Lender adequate protection, liens, and superpriority claims, and a release of all claims and causes of action, (b) is not the subject of a stay or an appeal, (c) may not be appealed, (d) has not been vacated, modified, or reversed, and (e) is acceptable to Lender in its sole and absolute discretion.

"*Permitted Encumbrances*" means (a) liens in favor of Lender created by this Agreement; (b) valid, enforceable, perfected, and unavoidable liens and security interests of the Prepetition Lenders only in property of the Debtor that existed on the Petition Date, provided that, such liens of the Prepetition Lenders are subordinated to Lender's liens and security interests in the Collateral and not subject to avoidance, subordination, recharacterization, or other challenge, as in each case in accordance with applicable law and as of the Petition Date; and (c) liens securing ad valorem taxes assessed against any piece of Collateral and due and owing to the applicable state or local taxing authority who under Texas state law has a first-priority lien that is valid, enforceable, perfected, and not subject to avoidance, subordination, recharacterization, or other challenge, in each case as of the Petition Date.

"*Person*" means any individual, corporation, limited liability company, business trust, association, company, partnership, joint venture, Governmental Authority, or other entity, and shall include such Person's heirs, administrators, personal representatives, executors, successors and assigns.

"*Prepetition Lenders*" means Texas Capital Bank, N.A. for itself and as Administrative Agent; American Bank of Texas; Liberty Capital Bank; Prosperity Bank; Stearns Bank National Association; Texas Heritage Bank; and Viewpoint Bank, N.A.

"*Prepetition Loan Documents*" means that certain Amended and Restated Construction Loan Agreement between Debtor and the Prepetition Lenders dated November 15, 2013 and all other documents identified as "*Loan Documents*" therein.

"*Prepetition Indebtedness*" means any and all sums due and owing to the Prepetition Lenders under the Prepetition Loan Documents.

"*Property Manager*" means Lincoln Property Company Commercial, Inc. d/b/a Lincoln Harris CSG.

"*Sole and Absolute Discretion*" means that, when the Agreement allows the Lender to act or not act in its sole and absolute discretion (whether or not those terms are capitalized), then:

(a)      The Lender is free to take or not take the action, with a view solely toward its own interests and desires as it perceives them.

(b)      The Lender's action or inaction per se is to be conclusively deemed to have complied with any applicable standard of reasonableness, good faith, or fair dealing.

(c)      No Person may make a claim against the Lender that is inconsistent with subsections (a) and (b) above.

"*Strategic Transaction*" means the sale of substantially all of Borrower's assets to a Third Party pursuant to §363 of the Bankruptcy Code.  The terms of the Strategic Transaction and identity of the Third Party shall each be satisfactory to Lender in Lender's sole and absolute discretion.

"*Strategic Transaction Milestones*" means any one or more of the following events.

(a)      Order entered by the Bankruptcy Court approving Debtor-in-Possession's retention of a broker acceptable to Lender and on terms acceptable to Lenders, both in Lenders' sole and absolute discretion not later than thirty (30) days after the Petition Date.

(b)      Order entered by the Bankruptcy Court approving the process for consummating a Strategic Transaction on terms acceptable to Lenders, in their sole and absolute discretion, not later than thirty (30) days after the Petition Date.

(c)      The Debtor-in-Possession has commenced the process of obtaining a Strategic Transaction on terms acceptable to Lenders, in their sole and absolute discretion, not later than twenty-five (25) days after the Petition Date.

(d)      The Debtor-in-Possession has received a letter of intent for a Strategic Transaction acceptable to Lender, in their sole and absolute discretion, not later than sixty (60) days after the Petition Date.

(e)      The Debtor-in-Possession has selected a Strategic Transaction that (i) proposes to repay in full in cash all credit extended under this Agreement; (ii) proposes to repay in full in cash all amounts due and owing to the Prepetition Lenders pursuant to the Prepetition Loan Documents; or (iii) is otherwise satisfactory to Lender, in its sole and absolute discretion, in each case not later than seventy-five (75) days after the Petition Date.

(f)      Order entered by the Bankruptcy Court approving the Debtor-in-Possession to consummate a Strategic Transaction and execute all of the documents and agreements related to such Strategic Transaction not later than ninety (90) days after the Petition Date, unless such date is extended by written agreement of Lenders and Debtor.

(g)      The Debtor-in-Possession has consummated a Strategic Transaction not later than one-hundred-twenty (120) days after the Petition Date, unless such date is extended by written agreement of Lenders and Debtor.

(h)      The employment of the Property Manager as the manager of the Debtor's real estate, including both the hospital facility and the medical office building, with Property Manager having sole and exclusive responsibility and authority for managing the Debtor's disbursements from its DIP accounts.

(i)    The employment of RAYMOND W. BATTAGLIA of the Law Offices of Ray Battaglia, PLLC approved by an order of the Bankruptcy Court as the Debtor-in-Possession's restructuring counsel.

"*Subsidiary*" means as to any Person, (a) any corporation more than fifty percent (50%) of the outstanding equity securities having ordinary voting power of which shall at the time be owned or controlled, directly or indirectly, by such Person or by one or more of its Subsidiaries or by such Person and one or more of its Subsidiaries, or (b) any partnership, association, joint venture or similar business organization more than fifty percent (50%) of the membership or ownership interests of which shall at the time be so owned or controlled. For purposes of this Agreement, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, association, joint venture, or similar business organization if such Person or Persons shall be allocated a majority of the partnership, association, joint venture, or similar business organization gains or losses or shall be or control the managing general partner of such partnership, association, joint venture or similar business organization.

"*Termination Date*" means the calendar date of the occurrence of the earlier of (a) February 3, 2016, or such other date as may be subsequently agreed to in writing between the Lenders and Debtor; (b) the date of consummation of a Strategic Transaction; and (c) an Event of Default.

All words and phrases used herein shall have the meaning specified in the Code except to the extent such meaning is inconsistent with this Agreement. All definitions contained in this Agreement are equally applicable to the singular and plural forms of the terms defined. The words "*hereof,*" "*herein*" and "*hereunder*" and words of similar import referring to this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Any accounting term used in the Loan Documents shall have, unless otherwise specifically provided therein, the meaning customarily given such term in accordance with GAAP, and all financial computations thereunder shall be computed, unless otherwise specifically provided therein, in accordance with GAAP consistently applied; provided, that all financial covenants and calculations in the Loan Documents shall be made in accordance with GAAP as in effect on the Effective Date unless Debtor-in-Possession and Lender shall otherwise specifically agree in writing. That certain items or computations are explicitly modified by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing.

2.    **Loan**.

(a)    **Debtor-in-Possession Loan**. Subject to the terms and conditions set forth in this Agreement and the Loan Documents, Lender hereby agrees, in its sole and absolute discretion, to make Advances of the Loan to Debtor-in-Possession from time to time in an aggregate amount not to exceed the Aggregate Commitment. During and after the Interim Availability Period, Lender shall not be required to (i) to make more than one (1) Advance hereunder; or (ii) to Advance any amount in excess of the Interim Availability Amount. The amount of the Initial Advance shall be limited to the lesser of (A) the Interim Availability Amount; and (B) an amount of funds approved and determined in Lender's sole and absolute discretion to be the minimum amount of funds required by Debtor-in-Possession to support Debtor-in-Possession's projected future expenditures to be incurred in Debtor-in-Possession's ordinary business operations during the first seven (7) calendar days set forth in the Budget. Subject to the terms of this Agreement, after the Initial Advance, Debtor-in-Possession may request Lender to make any Additional Advance(s) by delivering to Lender a written budget that supports an itemized request for financing based on a seven (7) calendar-day time period of anticipated future expenditures to be incurred in Debtor-in-Possession's ordinary business operations in conformity with the Budget ("*Additional Advance Request*"). Upon Lender's receipt of Debtor-in-Possession's Additional Advance Request, Lender will decide in its sole and absolute discretion whether to make any such Additional Advances. All Additional Advances extended by Lender, in Lender's sole and absolute discretion, will be strictly limited to the minimum

amount of funds required to support Debtor-in-Possession's projected seven (7) calendar-day time period explicitly set forth in Debtor-in-Possession's Additional Advance Request. Under no circumstances will Lender extend any Additional Advance more frequently than once every seven (7) calendar days. Under no circumstances will Lender extend any Additional Advance prior to Lender's approval, in its sole and absolute discretion, of Debtor-in-Possession's Additional Advance Request. All Additional Advance Requests shall conform to and become part of the Budget. Under no circumstances shall any Additional Advance Request contravene the contents set forth in the Budget.

(b)     **Repayment of Debtor-in-Possession Loan**.  On the Termination Date, any obligation of the Lender to make Advances to the Debtor-in-Possession shall terminate, and the Debtor-in-Possession shall repay the Loan in full in cash, together will all accrued and unpaid interest thereon and all fees and other amounts payable to Lender hereunder and under the Loan Documents. Lender shall be entitled to immediate payment of such amounts owed by Debtor-in-Possession without further application to or order of the Bankruptcy Court.

(c)     **Use of DIP-Loan Proceeds**.  The Loan Proceeds shall be used solely in strict compliance with the Budget, and as required under the Loan Documents.  Loan Proceeds shall be used for the following exclusive purposes: (i) to pay fees and expenses in connection with the Loan to the Lender in accordance with the Loan Documents; (ii) to pay certain general operating expenses incurred by the Debtor-in-Possession after the Petition Date; and (iii) certain costs and expenses related to the administration of the Bankruptcy Case, including reasonable fees of the Case Professionals and certain other expenses as contemplated in the Budget, allowed by the Bankruptcy Court, and as set forth in the Orders, or as consented to by Lender in its sole and absolute discretion.  All such amounts may be reallocated by Lender in its sole and absolute discretion, and such funds will be disbursed on an as-needed basis subject to the Debtor-in-Possession providing Lender with documents requested and approved by Lender in its sole and absolute discretion, including any Additional Advance Request, the Budget attached hereto as **Exhibit A**, and the Order, that adequately support Debtor-in-Possession's borrowing requests.  Debtor shall not make any disbursements other than those set forth in the Budget and any Additional Advance Request, approved in writing by the Lender in its sole and absolute discretion; provided, however, disbursements may exceed any line-item disbursement amount in the Budget or Additional Advance Request by no more than 5% on a cumulative basis from the Petition Date through the end of the Budget period. The Budget, and any amendments or modifications thereto, shall be in form and substance acceptable to Lender, in its sole and absolute discretion.  The Budget may be amended or modified in writing from time to time only with the prior express written consent of Lender, in its sole and absolute discretion, and such amendments or modifications shall not require the consent of the U.S. Trustee or approval of the Bankruptcy Court.  In addition to and without limiting the weekly reporting reconciliation described below, Debtor shall notify Lender in writing immediately upon learning of a material change in expected revenues or expenses. Lender, in its sole and absolute discretion, is entitled to evaluate whether or not such material changes require modification or amendment to the Budget.  Debtor shall deliver to Lender by 6:00 P.M. of Wednesday each week, a reconciliation of the prior week actual receipts and disbursements compared to receipts and disbursements contained in the Budget for that week, in the same line-item detail as contained in the Budget. The Budget shall include line-item disbursements for the Case Professionals, with such limited amounts being subject to the approval of the Lender, in its sole and absolute discretion.  So long as there are no Events of Defaults under this Agreement, budgeted amounts for the Case Professionals will be transferred each week pursuant to the Budget into a segregated account (the "*Pro Fee Account*") that is not subject to the Lender's or Prepetition Lenders' liens or security interests.  No fee may be paid from the Pro Fee Account until it has been authorized and approved by the Bankruptcy Court.  All advances under this Agreement are subject to the Budget, which must contain a detailed rolling 4-week cash flow budget (initially and all updates satisfactory to Lender in all respects) on a consolidated basis that includes, among other things, specific line items (which shall include, but not be limited to, reasonable expenses for Case

Professionals) for any and all categories of expenses and income, as anticipated by Debtor and as requested by Lender in its sole and absolute discretion.

(d) **Priority of the DIP-Loan Proceeds**. All borrowings and credit extended to Debtor under this Agreement shall be allowed in the Bankruptcy Case and treated under §364(c)(1) of the Bankruptcy Code as super-priority administrative expenses with the highest priority over all other administrative expenses allowed in the Bankruptcy Case, subject only to the Carve-Out, such that no costs or expenses of administration incurred in the bankruptcy and no other claims will be prior to, superior, or on parity with the Lender's claims against the Debtor or the Estate. No cost or expense of administration shall be imposed on Lender, its claims, or its collateral under §§105, 506(c), or 552 of the Bankruptcy Code or otherwise, and Debtor-in-Possession hereby waives for itself and on behalf of the Estate any and all rights under §§105, 506(c), or 552 of the Bankruptcy Code or otherwise to assert or impose, or seek to assert or impose, any such costs or expenses of administration against Lender or the Collateral. For the avoidance of doubt, (i) payment of the Carve-Out shall not reduce the amounts payable to Lender hereunder or under the other Loan Documents or affect the rights of Lender to receive such payment; and (ii) under no circumstances shall Lender be responsible or liable for, or itself obligated to pay, any of the fees or other items constituting the Carve Out.

3. **Note, Interest Rate, and Computation of Interest**.

(a) **Note**. The Loan and all Advances shall be evidenced by a Note duly executed by Debtor-in-Possession and payable to the order of Lender, in form and substance acceptable to Lender in its sole and absolute discretion. Interest on the Note shall accrue at the rates set forth therein. The principal of and interest on the Note shall be due and payable in accordance with the terms and conditions set forth in the Note and in this Agreement. All payments made by Debtor-in-Possession under this Agreement and the Loan Documents shall be made to Lender at Lender's offices as set forth herein in Dollars and immediately available funds, without setoff, deduction or counterclaim, and free and clear of all taxes, at the time and in the manner provided in the Note.

(b) **Commitment Fee**. On the Closing Date, Debtor shall pay the Commitment Fee from the Initial Advance.

(c) **Interest Rate**. Borrower promises to pay interest on the principal amount of the Loan from time to time outstanding at a rate per annum equal to the applicable interest rates set forth in the Note.

(d) **Payment of Principal and Interest**. Accrued interest on each Advance shall be payable on the Termination Date. The Loan shall be due and payable in full on the Termination Date. Payments shall be applied as required under applicable law and, in the absence of any such requirement, payments shall be applied in accordance with the terms of Note and this Agreement. All payments of principal (including prepayments) and accrued interest shall be paid by wire transfer in United States Dollars, to Lender, at such place as Lender may from time to time direct. All payments (including prepayments) to be made by Debtor hereunder and under the Note, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 1:00 p.m., Central Standard Time, on the due date thereof. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day, and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate set forth in the Note during such extension. Prepayments of the Loan shall be made in accordance with the terms set forth in the Note. Immediately upon any repayment of the Loan, the Aggregate Commitment shall be permanently reduced by the principal amount then repaid. Amounts repaid may not be re-borrowed.

(e) **Computation of Interest and Fees; Default Rate**. Fees and interest shall be calculated on the basis of a 360-day year for the actual days elapsed. In no event shall the accrual of interest under the applicable rates set forth in the Note exceed the Highest Lawful Rate. After the occurrence and during the continuance of an Event of Default, the applicable rate of interest accruing under the DIP Loan shall be increased to the applicable default rate of interest set forth in the Note.

(f) **Loan Indemnification**. Debtor shall indemnify and hold harmless Lender and its Affiliates, officers, directors, employees, agents, advisors, attorneys and representatives (each, an "*Indemnified Party*") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby, or any use made or proposed to be made with the proceeds of the Loan, whether or not such investigation, litigation or proceeding is brought by Debtor, any of its member, shareholders, or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or thereby are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to Debtor or any of its shareholders or creditors for or in connection with the transactions contemplated hereby or thereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages. Debtor hereby grants each Indemnified Party permission to select counsel of its own choosing, and Debtor agrees that it shall not withhold unreasonably its consent to such Indemnified Party's choice of counsel. Debtor permits each Indemnified Party to negotiate, mediate, arbitrate, or settle any and all claims, damages, losses, liabilities, and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be alleged or asserted against any Indemnified Party, subject only to Debtor's reasonable consent, and Debtor shall not withhold unreasonably its consent to such settlement. This Obligation on the part of Debtor shall survive the payment of the Obligations, the termination of the DIP Loan, and any cancellation of this Agreement. Without limitation of the foregoing, Debtor shall pay, and hold each Indemnified Party harmless from, any and all claims of any brokers, finders or agents claiming a right to any fees in connection with arranging the financing contemplated hereby.

(g) **Fees and Expenses**. On (i) the Closing Date, from the proceeds of the initial Advance, (ii) from time to time thereafter, upon demand by Lender, and (iii) on the Termination Date, Debtor shall pay or reimburse Lender for all fees (including legal fees), costs, charges and reasonable out-of-pocket expenses associated with (A) the preparation and negotiation of this Agreement and the other Loan Documents, (B) the consummation of the transactions described in this Agreement and the other Loan Documents, (C) administration of the Loan, and (D) the enforcement of rights and remedies set forth in this Agreement and the other Loan Documents, that have been billed to or incurred by Lender. Such reimbursements shall commence with the first such demand to occur after the Closing Date, but the obligation of Debtor to make any final reimbursement shall survive the Termination Date. If Debtor shall fail to pay any such fees, costs, charges and expenses within three (3) Business Days after demand or other time specified herein for such payment, such failure shall be deemed to constitute a written draw request under <u>Section 6(e)</u> herein delivered by Debtor requesting an Advance in the amount of such fees, costs, charges and expenses, the proceeds of which shall be applied by Lender to pay or to reimburse Lender for such fees, costs, charges and expenses.

4.     **Collateral**.

(a)     **Grant of Security Interest**.  As collateral security for the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the Indebtedness, Debtor-in-Possession hereby pledges to and grants Lender, a security interest in, all of the Debtor, the Debtor-in-Possession, and the Estate's right, title and interest in the Collateral, whether now owned by Debtor-in-Possession or hereafter acquired and whether now existing or hereafter coming into existence.  If Debtor-in-Possession at any time holds or acquires a commercial tort claim, Debtor-in-Possession shall notify Lender in writing within FIVE (5) Business Days of such occurrence with the details thereof, Debtor-in-Possession grants, and agrees that this Agreement shall be deemed to immediately perfect Lender in such claim and the proceeds thereof.  In its sole and absolute discretion, Lender may require Debtor-in-Possession to execute any document in connection therewith.  If the security interest granted hereby in any rights of Debtor-in-Possession under any contract or other agreement included in the Collateral is expressly prohibited by such contract, then the security interest hereby granted is nonetheless effective.

(b)     **Debtor-in-Possession Remains Liable**.  Notwithstanding anything to the contrary contained herein, (i) Debtor-in-Possession shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of Debtor-in-Possession's respective duties and obligations thereunder to the same extent as if this Agreement had not been executed; (ii) the exercise by Lender of any of its rights hereunder shall not release Debtor-in-Possession from any of its duties or obligations under the contracts and agreements included in the Collateral and (iii) Lender shall not have any obligation or liability under any of the contracts and agreements included in the Collateral by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of Debtor-in-Possession thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(c)     **Mandatory Prepayments**.  Each of the following shall require that the Debtor-in-Possession make a mandatory prepayment of the Loan.  The mandatory prepayments shall not exceed the obligations owed by the Debtor-in-Possession under the Loan Documents.

(i)     <u>Asset-Sale Prepayments</u>.  Upon consummation of any Asset Sale, Debtor-in-Possession shall make a mandatory prepayment of the Loan in an amount equal to 100% of the net cash proceeds of the Asset Sale.

(ii)     <u>Extraordinary-Receipt Proceeds</u>.  Upon receipt of any proceeds not customarily received in Debtor-in-Possession's ordinary course of business, including, without limitation, proceeds arising from insurance, condemnation, eminent domain, tax refunds, deposit refunds, Debtor-in-Possession shall make a mandatory prepayment of the Loan in an amount equal to 100% of the proceeds received.

(iii)     <u>Proceeds of Any Indebtedness</u>.  Upon receipt of any proceeds arising from the incurrence of any indebtedness, Borrower shall make a mandatory prepayment of the Loan in an amount equal to 100% of the proceeds received.

(iv)     <u>Overdraws</u>.  If, for any reason, (A) during the Interim Availability Period, the outstanding amount of the Loan (net of interest accrued for the then-current month) exceeds the Interim Availability Amount; or (B) at any other time prior to the Termination Date, the outstanding amount of the Loan (net of interest accrued for the then-current month) exceeds the Aggregate Commitment, then the Debtor-in-Possession shall immediately repay an amount equal to such excess.

(d)    **Application of Prepayments**.  Unless otherwise required by applicable law, prepayments shall be applied in accordance with the terms of <u>Section 13(d)</u>.

(e)    **Effect of Prepayments.**

(i)    Immediately upon prepayment of the Loan, the Aggregate Commitment shall be permanently reduced by the principal amount then prepaid.

(ii)    Amounts repaid may not be re-borrowed.

(f)    **No Discharge; Survival of Liens and Claims; Waiver of Priming Rights**.

(i)    Debtor-in-Possession agrees that no amounts owed under the Loan Documents shall be discharged or adversely affected or impaired by (A) the entry of an order confirming a Chapter 11 plan in the Bankruptcy Case pursuant to §1141(d)(4) of the Bankruptcy Code or otherwise, and Debtor-in-Possession hereby waives any such right to seek or receive such discharge); and (B) the conversion of the Bankruptcy Case from one under chapter 11 of the Bankruptcy Code to one under chapter 7 of the Bankruptcy Code, or (C) the dismissal of the Chapter 11 Case.

(ii)    Debtor-in-Possession agrees that the liens and superpriority administrative expense claims granted to Lender pursuant to the Loan Documents and the order approving the Loan Documents shall not be affected in any manner by (A) the entry of an order confirming a Chapter 11 plan in the Bankruptcy Case; (B) the appointment of an examiner or trustee in the Bankruptcy Case; or (iii) the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.

(g)    **Intellectual Property**.  To the extent Debtor-in-Possession owns, or is licensed to use, any Intellectual Property necessary to conduct its business as currently conducted (except for such Intellectual Property, the failure of which to own or license could not reasonably be expected to have a Material Adverse Effect), Debtor-in-Possession hereby acknowledges, agrees and covenants to maintain the patenting and registration of all Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office, or other appropriate Governmental Authority, and Debtor-in-Possession will promptly patent or register, as the case may be, all new Intellectual Property and notify Lender in writing **FIVE (5)** Business Days prior to filing any such new patent or registration.

(h)    **Additional Documents**.  To secure full and complete payment and performance of the Indebtedness, Debtor-in-Possession shall execute and deliver or cause to be executed and delivered all of the Loan Documents reasonably required by Lender covering the Collateral.  Debtor-in-Possession shall execute and cause to be executed such further documents and instruments, as Lender, in its reasonable discretion, deems necessary or desirable to create, evidence, preserve and perfect its liens and security interests in the Collateral.  In the event any of the Loan Documents evidencing or securing the Indebtedness misrepresents or inaccurately reflects the correct terms and/or provisions of the Indebtedness, each Obligor shall upon request by Lender and in order to correct such mistake, execute such new documents or initial corrected, original documents as Lender may deem reasonably necessary to remedy said errors or mistakes.  Each Obligor shall execute such other documents as Lender shall deem reasonably necessary to correct any defects or deficiencies in the Loan Documents.  Any Obligor's failure to execute such documents as requested shall constitute an Event of Default under this Agreement.

(i)    **Setoff**.  As further security for the Indebtedness, Debtor-in-Possession grants to Lender a lien and contractual right of set-off in and to all money and property of Debtor-in-Possession now

or at any time hereafter coming within the custody or control of Lender, including (without limitation) all certificates of deposit and other accounts, whether such certificates of deposit and/or accounts have matured or not, and whether the exercise of such right of set-off results in loss of interest or other penalty under the terms of the certificate of deposit or account agreement. It is further agreed that Lender shall have a lien on all deposits and other sums at any time credited by or due from Lender to Debtor-in-Possession as security for the payment of the Indebtedness, and Lender, at its option after the occurrence of a Default may without notice and without any liability, hold all or any part of any such deposits or other sums until all amounts owing under the Loan Documents have been paid in full, and/or Lender may apply or set-off all or any part of any such deposits or other sums credited by or due from Lender to or against any sums due under the Loan Documents in any manner and in any order of preference that Lender, in its sole and absolute discretion, chooses. The rights and remedies of Lender hereunder are in addition to any other rights and remedies (including, without limitation, other rights of setoff) that Lender may have.

5. **Lien Perfection**.

(a) Lender's liens and security interests in and to the Collateral shall attach to all Collateral without further action on the Lender's part. The liens and security interests and priority granted to the liens and security interests in Lender's favor pursuant to the Order and hereunder shall be perfected by operation of law upon entry of the Order by the Bankruptcy Court. Lender shall not be required to file any UCC-1 financing statements, mortgages, deeds of trust or any other document, or take any other action (including possession of any Collateral) to validate or perfect the liens and security interests granted to Lender hereunder or under any of the Loan Documents, as all such liens and security interests shall be deemed automatically perfected as of the date of the Order. If Lender shall, in its discretion, choose to file such UCC-1 financing statements (or amendments to or continuations of any existing financing statements), mortgages, deeds of trust and otherwise confirm perfection of such liens and security interests, all such financing statements, mortgages, or similar instruments shall be deemed to have been filed or recorded at the time and on the date of entry of the Order. Lender may, in its discretion, file a certified copy of the Order in any filing or recording office in any jurisdiction. The liens and security interests granted to Lender pursuant to the provisions of this Agreement and pursuant to any Loan Document shall be in addition to all liens conferred upon Lender by the Bankruptcy Court pursuant to the terms of the Order and any other order entered by the Bankruptcy Court.

(b) The liens and security interests granted pursuant to the terms of this Agreement and the Loan Documents, and the liens and security interests conferred upon Lender pursuant to the Order, shall constitute first-priority liens under §364(d)(1) of the Bankruptcy Code on all assets owned or acquired by the Debtor, the Debtor-in-Possession, or the Estate on the Petition Date and thereafter. Lender's liens on such accounts and inventory acquired after the Petition Date shall enjoy super-priority, senior and priming status against all other Persons notwithstanding that such property may be subject to prior-perfected and unavoidable liens held by any Person other than Lender. Except as expressly provided in the Order, no expense, cost, or charge in connection with the Case shall be charged against the Collateral or Lender under §506(c) of the Bankruptcy Code, and the Obligors hereby waive any rights they have to seek such charges under §506(c) of the Bankruptcy Code.

6. **Conditions Precedent**. The obligation of Lender to make any Advance under the Loan Documents is subject to the following conditions precedent such that Lender shall have received, or such conditions shall be otherwise satisfied, as of the Closing Date, to Lender's satisfaction:

(a) **Loan Documents**. The Loan Documents executed by each Obligor party thereto.

(b) **Entry of the Order**. Entry of the Interim Order and the other Orders, as required by the Bankruptcy Court and the Bankruptcy Code, including the final Order.

(c)     **Legal Restraints/Litigation**.    As of the Closing Date, and other than the Bankruptcy Case, there shall be no (i) injunction, writ or restraining order restraining or prohibiting the consummation of the financing contemplated hereunder, or (ii) suit, action, investigation, or proceeding (judicial or administrative) pending against the Debtor-in-Possession, any other Obligor, that, in the Lender's opinion, if adversely determined, could have a Material Adverse Effect and that is not subject to §362 of the Bankruptcy Code.

(d)     **Initial Extension of Credit**. The Initial Advance shall be subject to the following conditions:

(i)     Debtor shall be in compliance with all terms and conditions of the Loan Documents and the Orders.

(ii)     The Bankruptcy Court shall have entered the Interim Order in form and substance satisfactory to Lender authorizing the transactions contemplated in the Loan Documents, authorizing the granting of the superpriority claim and the superiority liens contemplated herein, and finding that Lender is extending financing to Debtor in good faith and Lender is entitled to the benefits of the provisions of 11 U.S.C. §364(e), which Order shall not have been reversed, modified, amended, stayed or subject to a motion for reargument or reconsideration.

(iii)     Negotiation and execution of the Loan Documents and all other documents and agreements, and completion of all filings for the benefit of Lender, related thereto or contemplated herein or therein.

(iv)     Receipt by Lender of all of Debtor's "first-day" motions prior to filing with the Bankruptcy Court in a form satisfactory to Lender, and the "first-day" orders pertaining thereto shall have been entered by the Bankruptcy Court and shall be in form and substance satisfactory to Lender.

(v)     Filing of Debtor's application with the Bankruptcy Court to retain a broker and the Property Manager in a form acceptable to Lender.

(vi)     Receipt and approval by Lender of the Budget.

(vii)     Since the Petition Date, there shall be no Material Adverse Effect to Debtor or its business or operations or assets or financial condition other than as may result from the filing of the Bankruptcy Case.

(viii)     Debtor shall have established its DIP accounts at Texas Capital Bank, N.A.

(e)     **Interim Extensions of Credit**. Each Additional Advance shall be subject to the following conditions:

(i)     Debtor shall be in compliance with all terms and conditions of the Loan Documents and the Orders.

(ii)     Satisfaction of all conditions of the initial extension of credit set forth in Section 6(d) hereinabove.

(iii)     No Event of Default shall exist under the Loan Documents.

(iv)     All representations and warranties of Debtor under the Loan Documents shall be true and correct in all material respects.

(v)     Submission by Debtor to Lender of an Additional Advance Request not more than once per calendar week, and at least 48 hours prior to any payment deadline, identifying the total amount sought to be borrowed by Debtor and detailing the expenses or disbursements sought to be paid by Debtor from the particular funding request. The total amount of funds sought to be borrowed by Debtor under an Additional Advance Request shall be limited to the minimum amount required to support Debtor's projected future expenses to be incurred in the natural course of Debtor's ordinary business operations for a period of seven (7) calendar days.

(vi)     The Interim Order(s) or the final Orders, as the case may be, shall be in full force and effect and have not been reversed, modified, amended or stayed.

(f)     **Other Matters**.  Such other documents and agreements as may be required by Lender in its reasonable discretion.

7.     **Representations and Warranties**.   Each Obligor hereby represents and warrants to Lender as follows:

(a)     **Existence**.  Each Obligor that is not a natural person (i) is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization; (ii) has all requisite power and authority to own its assets and carry on its business as now being or as proposed to be conducted; and (iii) is qualified to do business in all jurisdictions in which the nature of its business makes such qualification necessary and where failure to so qualify would have a Material Adverse Effect.  Each Obligor has the power and authority to execute, deliver, and perform its obligations under the Loan Documents to which it is or may become a party.

(b)     **Binding Obligations**.  The execution, delivery, and performance of the Loan Documents by each Obligor have been duly authorized by all necessary action by such Obligor, and constitute legal, valid and binding obligations of such Obligor, enforceable in accordance with their respective terms, except as limited by bankruptcy, insolvency or similar laws of general application relating to the enforcement of creditors' rights and except to the extent specific remedies may generally be limited by equitable principles.

(c)     **No Consent**.  After giving effect to the Order, the execution, delivery and performance of the Loan Documents, and the consummation of the transactions contemplated thereby, do not (i) conflict with, result in a violation of, or constitute a default under (A) any provision of the Constituent Documents (if any) or other instrument binding upon any Obligor, (B) any law, governmental regulation, court decree or order applicable to any Obligor, or (C) any contractual obligation, agreement, judgment, license, order or permit applicable to or binding upon any Obligor, (ii) require the consent, approval or authorization of any third party, or (iii) result in or require the creation of any lien, charge or encumbrance upon any property or asset of any Obligor except as may be expressly contemplated in the Loan Documents.

(d)     **Financial Condition**.  Each financial statement of each Obligor supplied to Lender truly discloses and fairly presents in all material respects such Person's financial condition as of the date of each such statement.  There has been no material adverse change in such financial condition or results of operations of any Obligor subsequent to the date of the most recent financial statement supplied to Lender.

(e)     **Operation of Business**.  Debtor-in-Possession possesses all contracts, licenses, permits, franchises, patents, copyrights, trademarks, and tradenames, or rights thereto, necessary to conduct

its businesses substantially as now conducted and as presently proposed to be conducted, and Debtor-in-Possession and is not in violation of any valid rights of others with respect to any of the foregoing, except any violations that could not reasonably be expected to have a Material Adverse Effect.

(f)  **Litigation and Judgments**.  Except for the Bankruptcy Case, there is no action, suit, investigation, or proceeding before or by any Governmental Authority or arbitrator pending, or to the knowledge of any Obligor, threatened against or affecting such Obligor that would, if adversely determined, have a Material Adverse Effect.  There are no outstanding judgments against any Obligor.

(g)  **Rights in Properties; Liens**.  Debtor-in-Possession has good and indefeasible title to or valid leasehold interests in its properties, including the properties and assets, and none of the Debtor-in-Possession's properties is subject to any lien, except the Permitted Encumbrances.

(h)  **Debt**.  Debtor-in-Possession has no Debt other than the debt identified in the bankruptcy schedules filed in the Bankruptcy Case by the Debtor-in-Possession.

(i)  **Disclosure**.  No statement, information, report, representation, or warranty made by any Obligor in the Loan Documents or furnished to Lender in connection with the Loan Documents or any of the transactions contemplated hereby contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not misleading.  There is no fact known to any Obligor that could reasonably be expected to have a Material Adverse Effect that has not been disclosed in writing to Lender.

(j)  **Subsidiaries, Ventures, Etc**.  Debtor-in-Possession has no Subsidiaries or joint ventures or partnerships.

(k)  **Compliance with Laws**.  No Obligor is in violation of any law, rule, regulation, order, or decree of any Governmental Authority or arbitrator, the violation of which could reasonably be expected to have a Material Adverse Effect.

(l)  **Taxes; Governmental Charges**.  No Obligor has knowledge of any pending investigation of such Obligor by any taxing authority or any pending but unassessed tax liability.

(m)  **Use of Proceeds; Margin Securities**.  Debtor-in-Possession is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of regulations of the Board of Governors of the Federal Reserve System), and no part of the proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock.

(n)  **ERISA**.  Debtor-in-Possession is in compliance in all material respects with all applicable provisions of the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations and published interpretations thereunder ("_ERISA_").  Neither a reportable event nor a prohibited transaction has occurred and is continuing with respect to any plan.  No notice of intent to terminate a plan has been filed, nor has any plan been terminated.  No circumstances exist that constitute grounds entitling the Pension Benefit Guaranty Corporation or any entity succeeding to all or any of its functions under ERISA (the "_PBGC_") to institute proceedings to terminate, or appoint a trustee to administer, a plan, nor has the PBGC instituted any such proceedings.  Neither Debtor-in-Possession nor any ERISA Affiliate has completely or partially withdrawn from a multiemployer plan.  Debtor-in-Possession and each ERISA Affiliate have met their minimum funding requirements under ERISA with respect to all of their plans, and the present value of all vested benefits under each plan do not exceed the fair market value of all plan assets allocable to such benefits, as determined on the most recent valuation

date of the plan and in accordance with ERISA. Neither Debtor-in-Possession nor any ERISA Affiliate has incurred any liability to the PBGC under ERISA.

(o) **Security Interest**. Debtor-in-Possession has and will have at all times full right, power and authority to grant a security interest in the Collateral to Lender in the manner provided herein, free and clear of any lien, security interest or other charge or encumbrance other than for the Permitted Encumbrances. This Agreement creates a legal, valid and binding security interest in favor of Lender in the Collateral securing the Indebtedness, such security interests subject in priority only to the Permitted Encumbrances.

8. **Affirmative Covenants**. Until all Indebtedness is indefeasibly paid or performed, Debtor-in-Possession agrees and covenants as follows:

(a) **Payment of Taxes**. Debtor-in-Possession will pay all of its tax liabilities, that, if not paid, could become a lien on any of its property, before the same shall become delinquent or in default, except where the validity or amount thereof is being contested in good faith by appropriate proceedings.

(b) **Maintenance and Conduct of Business**. Debtor-in-Possession will (i) keep, maintain and preserve all property (tangible and intangible) material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, (ii) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, agreements and franchises material to the conduct of its business, and (iii) engage in an efficient and economical manner in a business of the same general type and within Debtor-in-Possession's powers under Constituent Documents.

(c) **Books and Records; Inspection Rights**. Debtor-in-Possession will keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities. Debtor-in-Possession will permit any representatives designated by Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, to conduct examinations of and to monitor Lender's Collateral, and to discuss the Debtor's affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

(d) **Insurance**. Debtor-in-Possession will maintain insurance deemed reasonably necessary by Lender. Debtor-in-Possession will, at its own expense, maintain insurance with respect to all Collateral in such amounts, against such risks, in such form and with such insurers, as shall be satisfactory to Lender from time to time. Each policy of insurance maintained by Debtor-in-Possession shall (i) name Lenders as mortgagee/loss payee and Debtor-in-Possession and Lender as insured parties (without any representation or warranty by or obligation upon Lender), as applicable and as their interests may appear, and (ii) provide prior written notice of cancellation or of lapse shall be given to Lender by the insurer in accordance with the insurer's commercial practices as adopted from time to time. Debtor-in-Possession will deliver to Lender original or duplicate policies of such insurance. Debtor-in-Possession will also, at the request of Lender, duly execute and deliver instruments of assignment of such insurance policies and cause the respective insurers to acknowledge notice of such assignment. All insurance payments in respect of loss of or damage to any Collateral shall be paid to Lender and applied by Lender in accordance with the Loan Documents, provided, however, that so long as no Default exists, Debtor-in-Possession may use such insurance payments for the repair or replacement of such lost or damaged property.

(e) **Compliance with Laws**. Debtor-in-Possession will comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the

failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(f)  **Compliance with Agreements**.  Debtor-in-Possession will comply, in all material respects with all material agreements, contracts, and instruments binding on it or affecting its properties, assets or business.

(g)  **ERISA**.  Debtor-in-Possession will comply, and will cause each Subsidiary to comply, with all minimum funding requirements, and all other material requirements, of ERISA, if applicable, so as not to give rise to any liability thereunder.

(h)  **Notice of Indebtedness**.  Debtor-in-Possession will promptly inform Lender of the creation, incurrence or assumption by Debtor-in-Possession of any actual or contingent liabilities not permitted under this Agreement.

(i)  **Notices of Material Events**.  Debtor-in-Possession will furnish to Lender prompt written notice of the following:

(i)  Promptly after the same is available, all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of Debtor-in-Possession with the Bankruptcy Court or the United States Trustee in the Case, or distributed by or on behalf of Debtor-in-Possession to any official committee appointed in the Case;

(ii)  The occurrence of any Default;

(iii)  The filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against any Obligor that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect; and

(iv)  Any and all material adverse changes in any Obligor's financial condition and all claims made against any Obligor that could materially affect the financial condition of such Obligor.

Each notice delivered under this section shall be accompanied by a statement of an officer of Debtor-in-Possession setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

(j)  **Ownership and Liens**.  Debtor-in-Possession will maintain good and indefeasible title to the Collateral free and clear of all liens, security interests, encumbrances or adverse claims, except for Permitted Encumbrances.  Debtor-in-Possession will cause any financing statement or other security instrument with respect to the Collateral to be terminated, except for Permitted Encumbrances.  Debtor-in-Possession will defend at its expense Lender's right, title and security interest in and to the Collateral against the claims of any third party.

(k)  **Accounts and General Intangibles**.  Debtor-in-Possession will, except as otherwise provided herein, collect, at Debtor-in-Possession's own expense, all amounts due or to become due under each of the accounts and general intangibles.  In connection with such collections, Debtor-in-Possession may and, at Lender's direction, will take such action not otherwise forbidden herein as Debtor-in-Possession or Lender may deem reasonably necessary or advisable to enforce collection or performance of each of the accounts and general intangibles.  Debtor-in-Possession will also duly perform and cause to be performed all of its material obligations with respect to the goods or services, the sale or lease or rendition

of which gave rise or will give rise to each account and all of its obligations to be performed under or with respect to the general intangibles. Debtor-in-Possession also covenants and agrees to take any action and/or execute any documents that Lender may reasonably request in order to comply with law relating to the assignment of the accounts.

(l) **Chattel Paper, Documents and Instruments**. Debtor-in-Possession will take such action as may be reasonably requested by Lender in order to cause any chattel paper, documents or instruments to be valid and enforceable and will cause all chattel paper, and instruments to have only one original counterpart. Upon request by Lender, Debtor-in-Possession will deliver to Lender all originals of chattel paper, documents or instruments and unless such request is made, Debtor-in-Possession will not deliver possession of such chattel paper, documents or instruments to any Person and will mark all chattel paper, documents or instruments with a legend indicating that such chattel paper, document or instrument is subject to the security interest granted hereunder.

9. **Negative Covenants**. Until all Indebtedness is indefeasibly paid or performed, Debtor-in-Possession agrees and covenants as follows:

(a) **Fundamental Change**. Debtor-in-Possession will not (i) make any material change in the nature of its business as carried on as of the Closing Date, (ii) liquidate, merge or consolidate with or into any other Person without the prior written consent of Lender, (iii) make a change in organizational structure or the jurisdiction in which it is organized, or (iv) permit any change in Debtor-in-Possession's legal name, or the state of Debtor-in-Possession's organization to another jurisdiction.

(b) **Other Changes**. DEBTOR-IN-POSSESSION WILL NOT, WITHOUT THE PRIOR WRITTEN CONSENT OF LENDER, **(i)** CREATE, INCUR OR ASSUME INDEBTEDNESS FOR BORROWED MONEY, INCLUDING CAPITAL LEASES, OTHER THAN INDEBTEDNESS EXPRESSLY PERMITTED BY THE LOAN DOCUMENTS, **(ii)** SELL, TRANSFER, MORTGAGE, ASSIGN, PLEDGE, LEASE (OTHER THAN IN THE ORDINARY COURSE OF BUSINESS), GRANT A SECURITY INTEREST IN OR ENCUMBER ANY OF DEBTOR-IN-POSSESSION'S ASSETS (EXCEPT AS EXPRESSLY PERMITTED BY THE LOAN DOCUMENTS), OR **(iii)** SELL ANY OF DEBTOR-IN-POSSESSION'S ACCOUNTS, EXCEPT TO LENDER.

(c) **Debt**. Debtor-in-Possession will not create, incur, assume or permit to exist any Debt except for the following ("*Permitted Debt*"):

(i)     The Indebtedness;

(ii)     The Prepetition Indebtedness;

(iii)     Trade payables or similar obligations from time to time incurred in the ordinary course of business other than for borrowed money; and

(iv)     Other Debt existing on the Closing Date.

(d) **Liens**. Debtor-in-Possession will not create, incur, assume or permit to exist any Liens on its assets except for Permitted Encumbrances.

(e) **Loans**. Debtor-in-Possession will not make loans or guarantee any obligation of any other Person or entity, except upon the Lender's prior written consent.

(f) **Transactions With Affiliates**. Debtor-in-Possession will not enter into any transaction, including, without limitation, the purchase, sale or exchange of property or the rendering of

any service, with any Affiliate of Debtor-in-Possession, except in the ordinary course of and pursuant to the reasonable requirements of Debtor-in-Possession's business (upon prior written notice to Lender) and upon fair and reasonable terms no less favorable to Debtor-in-Possession than would be obtained in a comparable arm's-length transaction with a Person or entity not an Affiliate of Debtor-in-Possession.

(g) **Dividends or Distributions**. Debtor-in-Possession will not declare or pay any dividends or distributions on any equity interest of Debtor-in-Possession to any Person.

(h) **Impairment of Security Interest**. Debtor-in-Possession will not take any action that would in any manner impair the enforceability of Lender's security interest in any Collateral.

(i) **Compromise of Collateral**. Debtor-in-Possession will not adjust, settle, compromise, amend or modify any Collateral, except an adjustment, settlement, compromise, amendment or modification in good faith and in the ordinary course of business; provided, however, this exception shall terminate following written notice from Lender upon the occurrence and during the continuation of an Event of Default. Debtor-in-Possession shall provide to Lender such information concerning (i) any adjustment, settlement, compromise, amendment or modification of any Collateral, and (ii) any claim asserted by any account debtor for credit, allowance, adjustment, dispute, setoff or counterclaim, as Lender may reasonably request from time to time.

(j) **Change In Control**. Debtor-in-Possession shall not permit any change in Control of Debtor-in-Possession unless approved by the prior written consent of Lender, in its sole and absolute discretion.

10. **Reporting Requirements**. Until all Indebtedness is indefeasibly paid and satisfied, Debtor-in-Possession agrees and covenants that it will furnish or cause to be furnished the following:

(a) **Reports**. Any reports reasonably requested by Lender, specifically including, without limitation, periodic internally prepared financial statements, appraisals, and other information requested from time to time by Lender, in each case satisfactory to Lender.

(b) **Management Letters**. Promptly upon receipt thereof Debtor-in-Possession shall furnish to Lender, a copy of any management letter or written report submitted to Debtor-in-Possession by independent certified public accountants with respect to the business, condition (financial or otherwise), operations, prospects, or properties of Debtor-in-Possession.

(c) **ERISA Reports**. Promptly after the filing or receipt thereof, copies of all reports, including annual reports, and notices that Debtor-in-Possession files with or receives from the PBGC or the U.S. Department of Labor under ERISA; and as soon as possible and in any event within FIVE (5) Business Days after Debtor-in-Possession knows or has reason to know that any reportable event or prohibited transaction has occurred with respect to any plan or that the PBGC or Debtor-in-Possession has instituted or will institute proceedings under Title IV of ERISA to terminate any plan, a certificate of an officer of Debtor-in-Possession setting forth the details as to such reportable event or prohibited transaction or plan termination and the action that Debtor-in-Possession proposes to take with respect thereto.

(d) **GENERAL INFORMATION**. Debtor-in-Possession shall promptly deliver such other information concerning any Obligor as Lender may request.

11. **Rights of Lender**. Lender shall have the rights contained in this section at all times that this Agreement is effective.

(a)      **Deed of Trust and Financing Statements**.   Debtor-in-Possession hereby authorizes Lender to file one or more deeds of trust, financing or continuation statements, and amendments thereto, relating to the Collateral.  Debtor-in-Possession hereby irrevocably authorizes Lender at any time and from time to time to file in any Code jurisdiction any initial financing statements and amendments thereto that (i) indicate the Collateral (A) as all assets of Debtor-in-Possession or words of similar effect; regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Code, or (B) as being of an equal or lesser scope or with greater detail, and (ii) contain any other information required by Article 9 of the Code for the sufficiency or filing office acceptance of any financing statement or amendment.

(b)      **Power of Attorney**.  Debtor-in-Possession hereby irrevocably appoints Lender as Debtor-in-Possession's attorney-in-fact, such power of attorney being coupled with an interest, with full authority in the place and stead of Debtor-in-Possession and in the name of Debtor-in-Possession or otherwise, to take any action and to execute any instrument that Lender may deem necessary or appropriate to accomplish the purposes of this Agreement, including without limitation: (i) to obtain and adjust insurance required by Lender hereunder; (ii) to demand, collect, sue for, recover, compound, receive and give acquaintance and receipts for moneys due and to become due under or in respect of the Collateral; (iii) to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (i) or (ii) above; and (iv) to file any claims or take any action or institute any proceedings that Lender may deem necessary or appropriate for the collection and/or preservation of the Collateral or otherwise to enforce the rights of Lender with respect to the Collateral.

(c)      **Performance by Lender**.  If any Obligor fails to perform any agreement or obligation provided for in any Loan Document, Lender may itself perform, or cause performance of, such agreement or obligation, and the expenses of Lender incurred in connection therewith shall be a part of the Indebtedness, secured by the Collateral and payable by Debtor-in-Possession on demand.

(d)      **Debtor-in-Possession's Receipt of Proceeds**.   All amounts and proceeds (specifically including, without limitation, instruments, writings and accounts) received by Debtor-in-Possession in respect of the Collateral shall be received in trust for the benefit of Lender hereunder and, Debtor shall cause all such amounts and proceeds (specifically including, without limitation, instruments, writings and accounts) to be forwarded to a lockbox or, with Lender's consent, deposited in a blocked account under the control of Lender and applied to the Indebtedness in accordance with the Loan Documents.

(e)      **Notification of Account Debtors**.  Lender may notify any or all obligors under any accounts (i) of Lender's security interest in such accounts or general intangibles and direct such obligors to make payment of all amounts due or to become due to Debtor-in-Possession thereunder directly to Lender, upon an Event of Default, and (ii) to verify the accounts with such obligors.  Lender shall have the right, at the expense of Debtor-in-Possession, to enforce collection of any such accounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as Debtor-in-Possession.

(f)      **Restriction on Distributions**. Debtor shall not use any Indebtedness extended under the Loan Documents for the purpose of distributing or otherwise delivering any amounts attributable to management fees, dividends, acquisitions, investments, other Debt, liens, affiliate transactions, and capital expenditures, unless and except such disbursements are authorized by Lender's express prior written consent and set forth in the Budget.

(g)     **Sale of Assets**. Debtor shall not distribute, deliver or otherwise dispose of any proceeds obtained through the sale of any of Debtor's assets unless and except such disbursements are authorized by Lender's express prior written consent and an Order of the Bankruptcy Court.

(h)     **Chapter 11 Plan of Reorganization**. Debtor shall not propose any chapter 11 plan of reorganization that does not provide for the payment in full of all Indebtedness extended under the Loan Documents on the effective date of such Plan, and all obligations owed under the Prepetition Loan Documents, unless and except such chapter 11 plan of reorganization is approved by Lender and the Prepetition Lenders' express prior written consent.

(i)     **Access to Management**. Debtor and Debtor-in-Possession shall make its management, management company, and turnaround consultants available to Lender to discuss progress towards accomplishment of any Strategic Transaction, operations, financial performance, Budgets and Budget reconciliation of Debtor and Debtor-in-Possession and such other matters as Lender may reasonably request.

(j)     **Right to Credit Bid**. Debtor and Debtor-in-Possession hereby acknowledge and agree that Lender and Prepetition Lenders shall at all times possess the rights and legal and equitable remedies to credit bid the amount of the then outstanding balance of the Indebtedness or the Prepetition Indebtedness extended under the Loan Documents, such amount of Indebtedness or Prepetition Indebtedness to be determined at the time of the proposed disposition of any Collateral, with such credit bid rights applicable in any bid procedure or other process relating to any disposition of any Collateral, whether under a sale process pursuant to Section 363 of the Bankruptcy Code, under a chapter 11 plan of reorganization, or otherwise.

(k)     **No Marshaling**. Debtor-in-Possession agrees that in no event shall Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or otherwise, and Debtor-in-Possession agrees not to assert any such theory of law or equity as it relates to the Collateral or collection of the Loan.

12.     **Events of Default**.  Each of the following shall constitute an "*Event of Default*" under this Agreement:

(a)     **Payment Default**.  The failure, refusal or neglect of Debtor-in-Possession to pay when due any part of the principal of, or interest on the Indebtedness owing to Lender by Debtor-in-Possession.

(b)     **Performance or Warranty Default**.  Except as otherwise provided in this Agreement, the failure of any Obligor to timely and properly observe, keep or perform any covenant, agreement, warranty or condition required herein or in any of the Loan Documents or any other agreement with Lender.

(c)     **Representations**.  Any representation contained herein or in any of the Loan Documents made by an Obligor is false, misleading or erroneous in any material respect when made or when deemed to have been made.

(d)     **Default by Other Debt**. The occurrence of any event that permits the acceleration of the maturity of any Debt for borrowed money owing by any Obligor to any third party under any agreement or understanding that could result in a Material Adverse Effect.

(e)  **Judgment**.  The entry of any judgment against any Obligor or the issuance or entry of any attachments or other liens against any of the property of such Obligor.

(f)  **Action Against Collateral**.  The Collateral or any portion thereof is taken on execution or other process of law in any action.

(g)  **Change in Control**.  Any of the record or beneficial ownership of Debtor-in-Possession shall have been transferred, assigned or hypothecated to any Person, when compared to such ownership as of the Effective Date.

(h)  **ERISA Default**.  Any of the following events shall occur or exist with respect to Debtor-in-Possession or any ERISA Affiliate: (i) any prohibited transaction involving any plan; (ii) any reportable event with respect to any plan; (iii) the filing under Section 4041 of ERISA of a notice of intent to terminate any plan or the termination of any plan; (iv) any event or circumstance that might constitute grounds entitling the PBGC to institute proceedings under Section 4042 of ERISA for the termination of, or for the appointment of a trustee to administer, any plan, or the institution by the PBGC of any such proceedings; or (v) complete or partial withdrawal under Section 4201 or 4204 of ERISA from a multiemployer plan or the reorganization, insolvency, or termination of any multiemployer plan; and in each case above, such event or condition, together with all other events or conditions, if any, have subjected or could in the reasonable opinion of Lender subject Debtor-in-Possession to any tax, penalty, or other liability to a plan, a multiemployer plan, the PBGC, or otherwise.

(i)  **Action of Lien Holder**.  The holder of any lien or security interest on the Collateral (without hereby implying the consent of Lender to the existence or creation of any such lien or security interest on the Collateral), declares a default thereunder or institutes foreclosure or other proceedings for the enforcement of its remedies thereunder.

(j)  **Material Adverse Effect**.  Any event shall have occurred or is continuing which shall have had a Material Adverse Effect.

(k)  **Loan Documents**.  (i) The Loan Documents shall at any time after their execution and delivery and for any reason cease (A) to create a valid and perfected security interest (subject in priority only to the Permitted Encumbrances) in and to the Collateral; or (B) to be in full force and effect or shall be declared null and void, or (ii) the validity of enforceability the Loan Documents shall be contested by any Obligor or any other Person party thereto or any Obligor shall deny it has any further liability or obligation under the Loan Documents.

(l)  **Other**.

(i)  Any Obligor's breach of any provision of the Loan Documents;

(ii)  Making payments not expressly identified in the Budget;

(iii)  Failing to pay the expenses incurred and specifically described in the Budget;

(iv)  Any breach or other form of noncompliance with the Budget;

(v)  Expiration of the term of the Budget, unless a supplemental budget is approved upon the express written agreement between Debtor and Lender, in Lender's sole and absolute discretion;

(vi)     A default, violation, or breach of any term in any Order;

(vii)    Filing of a motion to convert the Case to a chapter 7 case;

(viii)   Filing of a motion to appoint a chapter 11 trustee or an examiner in the Case;

(ix)     Filing of a motion to dismiss this case;

(x)      Failure of the Bankruptcy Court to approve and enter the final Order approving the Loan, all terms of the Loan Documents, and authorizing Debtor's and Lender's consummation of all acts contemplated by the Loan Documents within 35 days after the Petition Date;

(xi)     The filing of an application, motion or other pleading seeking to amend, modify, supplement, or extend an Order approving the Loan without the prior written consent of Lender;

(xii)    Any reversal or modification without the express written consent of Lender of any order of the Bankruptcy Court affecting or relating to the Loan;

(xiii)   Filing or confirmation of a chapter 11 plan of reorganization that (A) does not provide for the indefeasible payment in full of all obligations owed to Lender and the Prepetition Lenders, specifically including, without limitation, all outstanding Indebtedness extended under the Loan and all obligations owed under the Prepetition Loan Documents; or (B) is not acceptable to Lender and Prepetition Lenders, in their sole and absolute discretion;

(xiv)    Other than the Permitted Encumbrances, granting or treating any other security interest, lien, claim, or encumbrance as *pari passu* with or senior to the claims of the Lender;

(xv)     Entry of any order granting relief from the automatic stay imposed by §362 of the Bankruptcy Code to the holder of any security interest or lien in property in which Lender holds a lien or security interest;

(xvi)    Any challenge to the extent, validity, priority, or unavoidability of Lender's or Prepetition Lenders' liens in and against property of the Debtor-in-Possession;

(xvii)   Any attempt to modify, reverse, rescind, vacate, or amend the Order without Lender's prior written consent;

(xviii)  Failure to close sale of substantially all of Debtor-in-Possession's assets by February 28, 2016;

(xix)    Filing of a motion to obtain additional financing from a party other than the Lender;

(xx)     Entry of an order by this Court granting relief from the automatic stay imposed by §362 of the Bankruptcy Code (A) to allow any creditor to execute on or enforce a lien or security interest on any Collateral, or (B) with respect to any lien or security interest of or to

permit the granting of any lien or security interest on any Collateral to any state or local agency or party;

(xxi) The filing of any claims or causes of action against Lender by Debtor or any creditor or party in interest in the Bankruptcy Case; including any Case Professional in the Bankruptcy Case.

(xxii) The filing by any party of any motion or proceeding which could reasonably be expected to result in material impairment of Lender's rights under the Loan Documents or Prepetition Lenders' rights under the Prepetition Loan Documents.

(xxiii) The filing of a motion to lift the stay against any property of the Debtor-in-Possession's bankruptcy estate; and

(xxiv) The failure to satisfy any single Strategic Transaction Milestone.

Nothing contained in this Agreement shall be construed to limit the events of default enumerated in any of the other Loan Documents and all such events of default shall be cumulative.

13. **Remedies and Related Rights**. If an Event of Default has occurred, and without limiting any other rights and remedies provided herein, under any of the Loan Documents or otherwise available to Lender, Lender may exercise one or more of the rights and remedies provided under the law.

(a) **Remedies**. Upon the occurrence of any one or more of the foregoing Events of Default, the Debtor's right to borrow under this Agreement and any obligation of the DIP Lender to loan under this Agreement shall both be terminated, and the entire unpaid balance of principal of the Note, together with all accrued but unpaid interest thereon, and all other Indebtedness owing to Lender by the Debtor-in-Possession or the Estate at that time shall, at the option of Lender, become immediately due and payable without further notice, demand, presentation, notice of dishonor, notice of intent to accelerate, notice of acceleration, protest or notice of protest of any kind, all of which are expressly waived by Debtor-in-Possession. All rights and remedies of Lender set forth in this Agreement and in any of the Loan Documents may also be exercised by Lender, at its option to be exercised in its sole and absolute discretion, upon the occurrence of an Event of Default, and not in substitution or diminution of any rights now or hereafter held by Lender under the terms of any other agreement.

(b) **Automatic Relief From Stay**. In addition to other remedies expressly set forth herein and those legal and equitable remedies available under applicable law, upon the occurrence of any Event of Default, Debtor's exclusive periods established under the Bankruptcy Code are terminated, and Lender and the Prepetition Lenders shall have immediate relief from the automatic stay and may foreclose on all or any portion of the Collateral, or otherwise exercise remedies against the Collateral permitted by applicable law. Before exercising any remedies against the Collateral, Lender must give five (5) days' advance written notice to Debtor, the Case Professionals, and the United States Trustee. During such five (5)-day notice period, Debtor is entitled to an emergency hearing with the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay of Section 362(a) of the Bankruptcy Code, as to Lender, shall be automatically terminated at the end of such notice period and without further notice or order.

(c) **Other Remedies**. Upon the occurrence of any one or more of the Events of Default, Lender may from time to time at its discretion, without limitation and without notice except as expressly provided in any of the Loan Documents:

(i)        Exercise in respect of the Collateral all the rights and remedies of a secured party under the Code (whether or not the Code applies to the affected Collateral);

(ii)        Reduce its claim to judgment or foreclose or otherwise enforce, in whole or in part, the security interest granted hereunder by any available judicial procedure;

(iii)        Sell or otherwise dispose of, at its office, on the premises of Debtor-in-Possession or elsewhere, the Collateral, as a unit or in parcels, by public or private proceedings, and by way of one or more contracts (it being agreed that the sale or other disposition of any part of the Collateral shall not exhaust Lender's power of sale, but sales or other dispositions may be made from time to time until all of the Collateral has been sold or disposed of or until the Indebtedness has been paid and performed in full), and at any such sale or other disposition it shall not be necessary to exhibit any of the Collateral;

(iv)        Buy the Collateral, or any portion thereof, at any public sale;

(v)        Buy the Collateral, or any portion thereof, at any private sale if the Collateral is of a type customarily sold in a recognized market or is of a type that is the subject of widely distributed standard price quotations; and

Debtor-in-Possession agrees that in the event Debtor-in-Possession is entitled to receive any notice under the Code, as it exists in the state governing any such notice, of the sale or other disposition of any Collateral, reasonable notice shall be deemed given when such notice is deposited in a depository receptacle under the care and custody of the United States Postal Service, postage prepaid, at Debtor-in-Possession's address set forth on the signature page hereof, **TEN (10)** days prior to the date of any public sale, or after which a private sale, of any of such Collateral is to be held.  Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(d)        **Application of Proceeds**.  If any Event of Default shall have occurred and is continuing, Lender may at its discretion apply or use any cash held by Lender as Collateral, and any cash proceeds received by Lender in respect of any sale or other disposition of, collection from, or other realization upon, all or any part of the Collateral as follows in such order and manner as Lender may elect:

(i)        To the repayment or reimbursement of the reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Lender in connection with (1) the administration of the Loan Documents, (2) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral, and (3) the exercise or enforcement of any of the rights and remedies of Lender hereunder;

(ii)        To the payment or other satisfaction of any liens and other encumbrances upon the Collateral;

(iii)        To the satisfaction of the Indebtedness;

(iv)        By holding such cash and proceeds as Collateral;

(v)        To the payment of any other amounts required by applicable law; and

(vi)    By delivery to Debtor-in-Possession or any other party lawfully entitled to receive such cash or proceeds whether by direction of a court of competent jurisdiction or otherwise.

(e)    **License**.  Lender is hereby granted a license or other right to use, following the occurrence and during the continuance of an Event of Default, without charge, Debtor-in-Possession's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, customer lists and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral, and, following the occurrence and during the continuance of an Event of Default, Debtor-in-Possession's rights under all licenses and all franchise agreements shall inure to Lender's benefit.

(f)    **Deficiency**.  In the event that the proceeds of any sale of, collection from, or other realization upon, all or any part of the Collateral by Lender are insufficient to pay all amounts to which Lender is legally entitled, each Obligor (unless otherwise provided) shall be liable for the deficiency, together with interest thereon as provided in the Loan Documents.

(g)    **Non-Judicial Remedies**.  In granting to Lender the power to enforce its rights hereunder without prior judicial process or judicial hearing, Debtor-in-Possession expressly waives, renounces and knowingly relinquishes any legal right which might otherwise require Lender to enforce its rights by judicial process.  Debtor-in-Possession recognizes and concedes that non-judicial remedies are consistent with the usage of trade, are responsive to commercial necessity and are the result of a bargain at arm's length.

(h)    **Use and Possession of Certain Premises**.  Upon the occurrence of an Event of Default, Lender shall be entitled to occupy and use any premises owned or leased by Debtor-in-Possession where any of the Collateral or any records relating to the Collateral are located until the Indebtedness is paid or the Collateral is removed therefrom, whichever first occurs, without any obligation to pay Debtor-in-Possession for such use and occupancy.

(i)    **Other Recourse**.  Each Obligor waives any right to require Lender to proceed against any third party, exhaust any Collateral or other security for the Indebtedness, or to have any third party joined with Debtor-in-Possession in any suit arising out of the Indebtedness or any of the Loan Documents, or pursue any other remedy available to Lender.  Each Obligor further waives any and all notice of acceptance of this Agreement and of the creation, modification, rearrangement, renewal or extension of the Indebtedness.  Each Obligor further waives any defense arising by reason of any disability or other defense of any third party or by reason of the cessation from any cause whatsoever of the liability of any third party.  Until all of the Indebtedness shall have been paid in full, Obligor shall have no right of subrogation and each Obligor waives the right to enforce any remedy that Lender has or may hereafter have against any third party, and waives any benefit of and any right to participate in any other security whatsoever now or hereafter held by Lender.  Each Obligor authorizes Lender, and without notice or demand and without any reservation of rights against such Obligor and without affecting such Obligor's liability hereunder or on the Indebtedness to (i) take or hold any other property of any type from any third party as security for the Indebtedness, and exchange, enforce, waive and release any or all of such other property, (ii) apply such other property and direct the order or manner of sale thereof as Lender may in its discretion determine, (iii) renew, extend, accelerate, modify, compromise, settle or release any of the Indebtedness or other security for the Indebtedness, (iv) waive, enforce or modify any of the provisions of any of the Loan Documents executed by any third party, and (v) release or substitute any third party.

(j)    **No Waiver; Cumulative Remedies**.  No failure on the part of Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power, or privilege under

this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies provided for in this Agreement and the Loan Documents are cumulative and not exclusive of any rights and remedies provided by law.

(k) **Equitable Relief**. Debtor-in-Possession recognizes that in the event Debtor-in-Possession fails to pay, perform, observe, or discharge any or all of the Indebtedness, any remedy at law may prove to be inadequate relief to Lender. Debtor-in-Possession therefore agrees that Lender, if Lender so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

14. **Affirmation of Prepetition Indebtedness**. Debtor stipulates, agrees and affirms as to the validity and amount of the Prepetition Indebtedness under the Prepetition Loan Documents, as such amounts may be set forth in Prepetition Lenders' proofs of claim filed in the Bankruptcy Case. Debtor stipulates, agrees and affirms that the Prepetition Indebtedness, agreements and documents are unavoidable and valid, binding, and enforceable according to their terms, without defense, counterclaim, or offset.

15. **Releases**. DEBTOR, THE DEBTOR-IN-POSSESSION, AND THE ESTATE IMMEDIATELY, FULLY, AND COMPLETELY RELEASES AND WAIVES LENDER AND PREPETITION LENDERS, THEIR RESPECTIVE PARENTS, AFFILIATES, AND SUBSIDIARIES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, ATTORNEYS AND AGENTS (COLLECTIVELY, THE "*Released Parties*") FROM AND AGAINST ANY AND ALL CLAIMS DEBTOR, THE DEBTOR-IN-POSSESSION, OR THE ESTATE MAY HAVE AGAINST THE RELEASED PARTIES PRIOR TO THE CLOSING DATE, INCLUDING, WITHOUT LIMITATION, ANY ACTS, DEALINGS OR CONDUCT OF THE PARTIES RELATING TO LENDER'S CLAIMS, THE PREPETITION INDEBTEDNESS AND PREPETITION LOAN DOCUMENTS, DEBTOR'S BUSINESS, DEBTOR'S ASSETS, THIS BANKRUPTCY CASE, OR ANY PAYMENTS OR OTHER TRANSFERS MADE AT ANY TIME TO ANY OF THE RELEASED PARTIES.

16. **Limitation of Liability**. Neither Lender nor any officer, director, employee, attorney, or agent of Lender shall have any liability with respect to, and Debtor-in-Possession hereby waives, releases, and agrees not to sue any of them upon, any claim for any special, indirect, incidental, or consequential damages suffered or incurred by Debtor-in-Possession in connection with, arising out of, or in any way related to, this Agreement, or any of the Loan Documents, or any of the transactions contemplated by this Agreement or any of the Loan Documents. Debtor-in-Possession hereby waives, releases, and agrees not to sue Lender or any of Lender's Affiliates, officers, directors, employees, attorneys, or agents for punitive damages in respect of any claim in connection with, arising out of, or in any way related to, this Agreement or any of the Loan Documents, or any of the transactions contemplated by this Agreement or any of the Loan Documents.

17. **No Duty**. All attorneys, accountants, appraisers, and other professional Persons and consultants retained by Lender shall have the right to act exclusively in the interest of Lender and shall have no duty of disclosure, duty of loyalty, duty of care, or other duty or obligation of any type or nature whatsoever to any Obligor or any of any Obligor's equity holders or any other Person. Documents in connection with the transactions contemplated hereunder have been prepared by MCGUIRE CRADDOCK & STROTHER P.C. ("*Lender's Counsel*"). Debtor-in-Possession acknowledges and understands that Lender's Counsel is acting solely as counsel to Lender in connection with the transaction contemplated herein, is not representing Debtor-in-Possession in connection therewith, and has not, in any manner, undertaken to assist or render legal advice to Debtor-in-Possession with respect to this transaction. Each Obligor has been advised to seek other legal counsel to represent each Obligor's interests in connection with the transactions contemplated herein.

18. **Lender Not Fiduciary**. The relationship between Obligors and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with any Obligor, and no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between any Obligor and Lender to be other than that of debtor and creditor.

19. **Waiver and Agreement**. Neither the failure nor any delay on the part of Lender to exercise any right, power or privilege herein or under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege. No waiver of any provision in this Agreement or in any of the Loan Documents and no departure by any Obligor therefrom shall be effective unless the same shall be in writing and signed by Lender, and then shall be effective only in the specific instance and for the purpose for which given and to the extent specified in such writing. No modification or amendment to this Agreement or to any of the Loan Documents shall be valid or effective unless the same is signed by the party against whom it is sought to be enforced.

20. **Benefits**. This Agreement shall be binding upon and inure to the benefit of Lender and Obligors, and their respective heirs, personal representatives, successors and assigns, provided, however, that no Obligor may, without the prior written consent of Lender, assign any rights, powers, duties or obligations under this Agreement or any of the Loan Documents.

21. **Notices**. All notices, requests, demands or other communications required or permitted to be given pursuant to this Agreement shall be in writing and given by (a) personal delivery, (b) expedited delivery service with proof of delivery, or (c) United States mail, postage prepaid, registered or certified mail, return receipt requested, sent to the intended addressee at the address set forth on the signature page hereof and shall be deemed to have been received either, in the case of personal delivery, as of the time of personal delivery, in the case of expedited delivery service, as of the time of the expedited delivery and in the manner provided herein, or in the case of mail, upon the **THIRD (3ᴿᴰ)** day after deposit in a depository receptacle under the care and custody of the United States Postal Service. Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by notice to the other party of such new address.

22. **Construction; Venue; Service of Process**. The Loan Documents have been executed and delivered in the State of Texas, shall be governed by and construed in accordance with the laws of the State of Texas, and shall be performable by the parties hereto in the county in Texas where Lender's address set forth on Lender's signature page hereof is located (the "*Venue Site*"). Any action or proceeding against any Obligor under or in connection with any of the Loan Documents may only be brought in the Bankruptcy Court. Each Obligor hereby irrevocably (a) submits to the exclusive jurisdiction of the Bankruptcy Court, and (b) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in any such court or that any such court is an inconvenient forum. Each Obligor agrees that service of process upon it may be made by certified or registered mail, return receipt requested, at its address specified or determined in accordance with the provisions of this Agreement. Nothing in any of the Loan Documents shall affect the right of Lender to serve process in any other manner permitted by law.

23. **Invalid Provisions**. If any provision of the Loan Documents is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable and the remaining provisions of the Loan Documents shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance.

24. **Conflicts**. Except as otherwise expressly provided in the Note, in the event any term or provision of this Agreement is inconsistent with or conflicts with any provision of the Loan Documents, the terms and provisions contained in this Agreement shall be controlling.

25.     **Counterparts**.  The Loan Documents may be separately executed in any number of counterparts, each of which shall be an original, but all of which, taken together, shall be deemed to constitute one and the same instrument.

26.     **Survival**.  All representations and warranties made in the Loan Documents or in any document, statement, or certificate furnished in connection with this Agreement shall survive the execution and delivery of the Loan Documents, and no investigation by Lender or any closing shall affect the representations and warranties or the right of Lender to rely upon them.

27.     **Waiver of Right to Trial by Jury**.  **THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM THAT RELATES TO OR ARISES OUT OF THE LOAN DOCUMENTS OR THE ACTS OR FAILURE TO ACT OF OR BY LENDER IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS AGREEMENT OR THE LOAN DOCUMENTS.**

28.     **Patriot Act Notice**.  Lender hereby notifies each Obligor that pursuant to the requirements of Section 326 of the USA Patriot Act of 2001, 31 U.S.C. §5318 (the "*Act*"), that Lender is required to obtain, verify and record information that identifies such Obligor, which information includes the name and address of such Obligor and other information that will allow such Lender to identify such Obligor in accordance with the Act.

29.     **Disclosure Relating to Collateral Protection Insurance**.  As of the date of this disclosure, Debtor-in-Possession and Lender have or shall have consummated a transaction pursuant to which Lender has agreed to make a DIP Loan to Debtor-in-Possession.  Debtor-in-Possession has pledged Collateral to secure the Indebtedness in accordance with the Loan Documents.  This notice relates to Debtor-in-Possession's obligations with respect to insuring the Collateral against damage.  To this end, Debtor-in-Possession must do the following:

        (a)     Keep the Collateral insured against damage in the amount equal to the Indebtedness plus the Prepetition Indebtedness or as otherwise required by the Loan Documents and the Prepetition Loan Documents;

        (b)     Purchase the insurance from an insurer that is authorized to do business in Texas or an eligible surplus lines insurer;

        (c)     Name Lender and Prepetition Lenders the person to be paid under the policy in the event of loss; and

        (d)     Deliver to Lender a copy of the policy and proof of the payment of premiums.

Lender may obtain collateral protection insurance on behalf of Debtor-in-Possession at Debtor-in-Possession's expense if Debtor-in-Possession fails to meet any of the foregoing requirements.

30.     **Savings Provision**.  Nothing in this agreement impairs, diminishes, or otherwise negatively affects the rights of the Texas Capital Bank granted, given, received, or otherwise in or related to the Texas Capital Bank Loans or an order of the Bankruptcy Court, including Cash Collateral.

31.     **Notice of Final Agreement**.  It is the intention of each Obligor and Lender that the following **NOTICE OF FINAL AGREEMENT** be incorporated by reference into each of the Loan Documents (as the same may be amended, modified or restated from time to time).  Each Obligor and Lender warrant and represent that the entire agreement made and existing by or among each Obligor and

Lender with respect to the DIP Loan is and shall be contained within the Loan Documents, and that no agreements or promises exist or shall exist by or among, any Obligor and Lender that are not reflected in the Loan Documents.

## *NOTICE OF FINAL AGREEMENT*

**THIS AGREEMENT AND THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES, AND THE SAME MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

[SIGNATURE PAGE FOLLOWS]

AGREED as of the Effective Date.

**LENDER**:                                             **Address**:

**TEXAS CAPITAL BANK N.A.**                             J. Mark Chevallier
                                                        McGuire, Craddock & Strother, P.C.
                                                        2501 North Harwood, Suite 1800
                                                        Dallas, Texas 75201
By:_____                     T: 214.954.6807
Name:_____                     MChevallier@mcslaw.com
Title:_____


**With Copies of Notices to:**

**DEBTOR**:                                             **Address**:

**FPMC SAN ANTONIO REALTY PARTNERS,**                   Raymond W. Battaglia
**LP**, a Texas limited partnership                     Law Offices of Ray Battaglia, PLLC
                                                        66 Granburg Circle
By:  Neal Richards Group San Antonio                    San Antonio, Texas 78218
     Development, LLC, a Texas limited liability         T: 210.601.9405
     company, its sole general partner                  RBattaglialaw@outlook.com


     By:_____
         Todd A. Furniss, Manager and
         Chief Executive Officer

# EXHIBIT A

## BUDGET

*[To Be Attached]*